## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
## DENVER DIVISION

| | |
|---|---|
| **WOOLLEY'S CLASSIC SUITES-DENVER, LLC, and ROBERT EDWARD WOOLLEY, INDIVIDUALLY AND AS TRUSTEE OF THE ROBERT EDWARD WOOLLEY FAMILY TRUST,** )<br>)<br>)<br>)<br>)<br>) | |
| **Plaintiffs,** ) | **CIVIL ACTION NO.:** _____ |
| ) | |
| **v.** ) | |
| ) | |
| **FIRST NATIONAL BANK,** ) | |
| ) | |
| **Defendant.** ) | |

## PLAINTIFFS' ORIGINAL COMPLAINT FOR
## DECLARATORY RELIEF AND DAMAGES AND PLAINTIFFS' JURY DEMAND

Plaintiffs Woolley's Classic Suites-Denver, LLC ("Woolley Denver") and Robert Edward Woolley ("Mr. Woolley"), individually and as Trustee of the Robert Edward Woolley Family Trust (the "Trust") (together, "Plaintiffs"), file this Plaintiffs' Original Complaint for Declaratory Relief and Damages and Plaintiffs' Jury Demand against defendant First National Bank (the "Bank"), based on personal information as to their own actions and on information and belief as to all other matters, as follows:

## I.

## PRELIMINARY STATEMENT

1.      Mr. Woolley is a legend in the hotel industry.  For more than 50 years, he has been one of the industry's most successful and innovative leaders.  He originated the all-suite hotel concept which was later popularized by Embassy Suites and is now utilized by virtually all major hotel brands.  He also has owned, managed, and franchised hundreds of hotels across the

country worth billions of dollars. His focus has always been to provide business travelers and families with a beautiful, clean, and safe place to stay.

2.      Today, Mr. Woolley is the President and Chief Executive Officer of Woolley's Classic Suites, his latest effort to redefine once again the hospitality industry with all-suite hotels offering services and upscale amenities typically available in only much pricier hotels. Mr. Woolley with his son, Robert Woolley, Jr. ("Robert Jr."), believe Woolley's Classic Suites fills a void in the market.

3.      After spending an enormous amount of time, money, and effort analyzing the perfect market for their flagship hotel, Mr. Woolley and his son decided to build their first hotel for their new brand, Woolley's Classic Suites, in Denver, Colorado (the "Denver Hotel"). Woolley Denver is the owner of the Denver Hotel, which opened in May 2014, and is a four-story property with 191 suites located near the Denver International Airport. Mr. Woolley firmly believes that this is the best location for a hotel that he has seen in his more than 50 years in the hotel industry.

4.      In December 2015, pursuant to the Loan Agreement attached hereto as Exhibit A, the Bank made a 10-year loan for $26,500,000 to Woolley Denver to take out the construction loan for the Denver Hotel (the "Loan"). Prior to completing the Loan, Mr. Woolley spent many hours with officers of the Bank explaining his vision for the hotel, the reasons why the location was so special, the economics of the hotel, and its unique place in the market.

5.      The Bank prepared all the documents for the Loan, including the Loan Agreement, which all are one-sided in favor of the Bank. Nonetheless, the Bank remained unsatisfied with the terms of the Loan Agreement it drafted. As a result, even though Woolley Denver has made every monthly Loan payment to the Bank on time and in full and complied

with every onerous and unnecessary covenant imposed by the Bank, the Bank improperly threatened to invoke inapplicable default provisions unless Plaintiffs agreed to rewrite the Loan Agreement to require an immediate pay down of the Loan by millions of dollars to which the Bank is not entitled. The paydown demanded by the Bank exceeds $9 million. Quite simply, the Bank sought "to change the rules in the middle of the game" to take advantage of Plaintiffs.

6.      To that end, the Bank made material misrepresentations to Plaintiffs by contending that Woolley Denver was in default based on an alleged failure to comply with section 7.33 of the Loan Agreement (the "DSCR Covenant"). That covenant seeks to ensure that Woolley Denver has enough cash to repay the Loan. However, the fact is that Woolley Denver was *never* in default based on that covenant because, based on the applicable default provision, Woolley Denver is not in default if it "promptly commences and thereafter diligently continues to pursue the satisfaction of" the covenant, which Woolley Denver is doing. In addition, the fact that Woolley Denver has timely made every monthly payment in full independently demonstrates that Woolley Denver has more than enough cash to satisfy its obligations to the Bank.

7.      Despite Woolley Denver's meticulous compliance with its obligations under the Loan Agreement, including its thicket of one-sided covenants, the Bank has repeatedly falsely represented to Plaintiffs that Woolley Denver is in default under the agreement. The Bank also breached the Loan Agreement and its implied covenant of good faith and fair dealing to apply additional undue pressure on Plaintiffs, thereby causing Plaintiffs to suffer damages.

8.      Through material misrepresentations and other misconduct, the Bank has taken actions intended to destroy the Denver Hotel and Mr. Woolley's dream. Based on his experience in the hotel industry, Mr. Woolley is certain that the Denver Hotel will be wildly successful.

But, unfortunately, the Bank through its wrongful actions has attempted to whittle down to mere months the time available for Plaintiffs to realize that potential – to the detriment of this property and its ability to be the flagship for a new nationwide chain.

9.      Plaintiffs now seek declaratory relief and monetary damages based on the Bank's misconduct.

## II.

## PARTIES

10.     Woolley Denver is a limited liability company, duly organized and existing under the laws of the State of Texas.  Its principal place of business is located at 11700 Preston Road, Suite 660, #219, Dallas, Texas 75230.

11.     Mr. Woolley is a resident of Dallas, Texas, a principal of Woolley Denver, and the sole trustee of the Trust, which was established by Mr. Woolley, as settlor, under Texas law in March 2006.  Mr. Woolley and the Trust are each a guarantor (together, the "Guarantors") of certain obligations under the Loan Agreement.

12.     The Bank is a national bank that is deemed to be a citizen of the State where it is located, which is South Dakota.

## III.

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. § 1332, the Court has jurisdiction over the subject matter of this action because complete diversity of citizenship exists among Plaintiffs and the Bank, and the amount in controversy exceeds $75,000.

14.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property that is the subject of the action is situated, in this judicial district.

15.     The Court has personal jurisdiction over the Bank because it does business in the State of Colorado and consents to this Court exercising jurisdiction over it in the Loan Agreement.

**IV.**

**FACTUAL BACKGROUND**

**B.     Mr. Woolley Forms Woolley's Classic Suites And Selects Denver For Its First Hotel.**

16.     Mr. Woolley is a true Horatio Alger story in our midst.  At an early age after serving his country in the armed forces, he traveled west from his humble beginnings in Scranton, Pennsylvania to start his first hotel by using his plumbing and other artisan skills to convert an old apartment complex into a hotel in Phoenix, Arizona.  The rest is history.

17.     After selling his wildly successful Crown Sterling Suites hotel chain in the late 1990s, Mr. Woolley thought that at age 66, he was ready to retire and spend his time enjoying his children and grandchildren and travelling the world.

18.     Mr. Wooley, however, always dreamed about doing business with his son, Robert Jr.  In 2011, Mr. Woolley and his son launched Woolley's Classic Suites as a new collection of all-suite upscale hotels offering more spacious suites, upscale comfort with modern amenities, and a lush resort ambiance, including tropical atriums, complimentary breakfasts, and happy hour services.

19.     Before launching this innovative new brand, Mr. Woolley and his son did their due diligence.  For years, they analyzed the hotel markets to learn the new trends.  They carefully researched what the business travelers and families today were looking for in a hotel.

20.     The Denver Hotel is the first hotel for the new collection.  As stated above, Mr. Woolley spent substantial time, money, and effort scouting for sites across the country.  Based on his experience, he focused on metropolitan areas with busy airports and expanding

economies that did not have sufficient quality hotels nearby their busy and growing airports because he believed these markets were underserved. He knew that the preferences of business travelers have changed and that they were looking for amenities that existing hotels in these areas were not providing.

21.     Every suite in the Denver Hotel is beautifully appointed with sophisticated, quality furnishings. The suites have luxurious baths with double sinks, full spa tubs, and glass-enclosed walk-in showers that are finished with marble tops and white Carrera marble floors. As is the case in all hotels developed by Mr. Woolley, the suites include luxurious linens and beddings with superior quality mattresses. There are also spacious closets, 46-inch wall-mounted flat screen televisions, plush club chairs, dining tables, wet bars with refrigerators, microwaves, and coffeemakers.

22.     The Denver Hotel is located approximately 10 miles from the Denver International Airport and 13 miles from downtown Denver. Woolley's Classic Suites selected Denver as the site for its first hotel because Denver is a first-class, year-round leisure and business destination. The hotel is strategically located near the Denver International Airport, which is the only major hub airport within a 500-mile radius, and many visitors stay in the Denver area on their way to winter skiing or other outdoor activities in the Rocky Mountains.

**C.     The Denver Hotel Experiences A Typical "Ramp Up" Period.**

23.     A new hotel typically experiences a "ramp up" period of approximately five years to establish its name in the market and stabilize its financial performance – and, thereby, achieve sustained profitability. When it made the Loan, the Bank was fully aware that the Denver Hotel was a new property that would be subject to a "ramp up" period. The Denver Hotel is in the third year of its "ramp up" period.

24.     During his numerous discussions with the Bank before it made the Loan, Mr. Woolley explained the challenges and opportunities facing a new hotel that is part of a new chain. Such a hotel does not have access to its own worldwide reservation system and the advertising associated with the larger, more established brands. Mr. Woolley explained this to the Bank and took all that into account when designing his hotel and its business plan. He also stressed to the Bank that the ramp up period for this hotel may be longer than new hotels that are part of a nationwide or worldwide chain.

25.     Nonetheless, soon after its opening in May 2014, the Denver Hotel secured a #1 ranking on TripAdvisor and became the top performing hotel in its market. In addition, the Denver Hotel's financial performance has improved every month since its opening, and the first quarter of 2018 was the Denver Hotel's best quarter since it opened.

26.     Moreover, the entire area surrounding the Denver International Airport is experiencing significant growth, with more and more businesses opening near the Denver Hotel. For example, the University of Colorado at Denver Medical Center is located near the Denver Hotel and just completed a huge expansion with the new Children's Hospital and the nearby Veteran's Administration Hospital.

27.     Overall, the Denver economy is doing extraordinarily well and all indicators suggest that it will only get better going forward. The financial performance and value of the Denver Hotel will also continue to improve as a result.

**D.      Woolley Denver Obtains The Loan From The Bank.**

28.     Woolley Denver and the Bank entered into the Loan Agreement on or about December 16, 2015. During the discussions for the Loan, the Bank told Mr. Woolley on a number of occasions that they were impressed with his experience and success in the hotel industry and his visions for the Denver Hotel and his new hotel chain. In fact, they were so

impressed that the Bank wanted the opportunity to participate in other hotel projects that Mr. Woolley developed.

29.     To this end, the Bank showed great interest in a hotel project that Mr. Woolley was planning to be located near the Dallas/Fort Worth International Airport. In fact, the Bank demanded that Mr. Woolley assure them that he would give them the opportunity to participate in that project.

30.     Counsel for the Bank drafted the Loan Agreement and accompanying documents.

31.     Based on the fact that he was suffering from macular degeneration, Mr. Woolley was not able to read the Loan Documents.

32.     The Loan Agreement includes numerous covenants intended to ensure that the Bank would be paid in full. Among those covenants are: (i) the DSCR Covenant in section 7.33 of the Loan Agreement; (ii) section 7.29 of the Loan Agreement; (iii) section 7.28 of the Loan Agreement; and (iv) section 7.06(c) of the Loan Agreement.

33.     The DSCR Covenant of section 7.33 of the Loan Agreement is entitled "Dividends and Distributions" and provides that Woolley Denver:

> shall maintain a Debt Service Coverage Ratio of at least a 1.25:1.00 prior to and a Debt Service Coverage Ratio of at least 1:00:1.00 after dividends and distributions. The ratio shall be measured annually upon receipt of a Certified Public Accountant's prepared audited financial statements and shall be defined as the EBITDA/annual principal and interest payments required to amortize the Loan (EBITDA less dividends and distributions in case of post coverage).

34.     The purpose of the DSCR Covenant is to ensure that Woolley Denver has enough cash to repay the Loan on a yearly basis.

35.     Section 8(d) of the Loan Agreement provides that an "Event of Default" occurs when a covenant:

> is not performed, observed or otherwise satisfied within a reasonable period of time after receipt of written notice thereof from Lender, which period of time

shall not exceed thirty (30) days unless, due to the nature of the obligation required to be performed by Borrower it cannot, within the reasonable means of Borrower . . ., be performed in such 30-day period, in which case no default shall occur as long as Borrower promptly commences and thereafter diligently continues to pursue the satisfaction of such obligation.

36.     Under section 8(d) of the Loan Agreement, therefore, an alleged failure to comply with section 7.33 does not result in a default if Woolley Denver "promptly commences and thereafter diligently continues to pursue the satisfaction" of the requirements of section 7.33.

37.     Section 7.29 of the Loan Agreement is a covenant which prohibits the incurrence of any liens against the Denver Hotel, including mechanic's liens, other than the Bank's liens.

38.     Section 7.28 of the Loan Agreement provides that except for certain trade debt, Woolley Denver would not incur any other debt without the Bank's written consent if an "Event of Default has occurred and is continuing."

39.     Section 7.06 of the Loan Agreement requires Woolley Denver to provide certain financial information to the Bank.

40.     Simultaneously, Mr. Woolley, individually and for the Trust, also executed a Guarantor Certificate and a Guaranty, respectively, in favor of the Bank that renders the Guarantors liable for the timely and full repayment of the Loan.

**E.     The Bank Makes Threats That Woolley Denver Is In Default Under The Loan Agreement.**

41.     Starting in 2016, the Bank began contending that Woolley Denver was not in compliance with the DSCR Covenant of section 7.33 of the Loan Agreement. Mr. Woolley was surprised by this position because Woolley Denver had been making each monthly payment in full on a timely basis, which was the purpose of the DSCR Covenant.

42.     Throughout the short life of the Loan, Mr. Woolley made sure that he was in constant contact with the Bank. He took every opportunity to keep them apprised of the Denver

Hotel's operations and financial performance. Mr. Woolley is proud of the Denver Hotel, so he wanted to make sure the Bank was provided with all the information necessary to understand its finances and operations.

43.     Nevertheless, the Bank continued to inform Woolley Denver that it was in default under sections 7.33 and 8(d) of the Loan Agreement. And, in late March 2018, the Bank presented Woolley Denver with a proposed "Loan Covenant Waiver Agreement," pursuant to its continued threats that Woolley Denver was not complying with the DSCR Covenant under section 7.33.

44.     The Bank's proposed Loan Covenant Waiver Agreement states that Woolley Denver was not in compliance with the DSCR Covenant as of either December 31, 2016, or December 31, 2017. Nonetheless, it also acknowledges that Woolley Denver reduced the principal amount of the Loan from $26,500,000.00 to $25,225,227.55, and "is in compliance with all other terms and conditions of the Loan Agreement."

45.     The Bank offered Woolley Denver a one-time waiver of the DSCR Covenant so long as the following conditions, among others, were met:

a.      Woolley Denver must achieve the required ratio "prior to dividends at the end of the fiscal year 2018," or it will be in default of the DSCR Covenant;

b.      If Woolley Denver fails to achieve the required ratio, it must reduce the principal of the Loan, within 90 days of notice from the Bank of the deficiency, to an amount where a reduced principal and interest payment over the remaining life of the Loan would meet the DSCR Covenant; and

c.      The Guarantors must maintain "sufficient unencumbered and unrestricted

liquid funds" to be able to satisfy the DSCR Covenant.

46.     At that time, the Bank did not issue a written notice of default to Woolley Denver.

**F.    The Bank Causes A Mechanic's Lien To Be Filed Against The Denver Hotel.**

47.     Over the next few months, the Bank continued to pressure Woolley Denver to execute the proposed Loan Covenant Waiver Agreement. Woolley Denver, however, refused to do so in light of the unreasonable demands made by the Bank, including granting the Bank the ability to immediately declare the Loan in default if Woolley Denver was unable to reduce the principal to an amount where the amended principal and interest payments would satisfy the DSCR Covenant, even though the Loan Agreement required no such reduction in principal. Nevertheless, Woolley Denver and the Bank engaged in additional discussions in an effort to find a mutually beneficial business solution. Woolley Denver also made sure to keep the Bank updated on its efforts to continue to maximize the performance of the Denver Hotel, including, among other things, inviting the Bank to visit the property.

48.     Meanwhile in March 2018, Woolley Denver was required to hire a contractor (the "Contractor") to undertake emergency repairs to the Denver Hotel when leaks were discovered in two boilers. The boilers had to be replaced. The Contractor billed Woolley Denver almost $140,000 for materials, supplies, and labor to complete those repairs. Woolley Denver hired the Contractor with the understanding that the Bank would comply with its obligations under the Loan Agreement to release funds from the repair and replacement reserve to pay the Contractor.

49.     Section 3.03 of the Loan Agreement requires Woolley Denver to make monthly deposits with the Bank for "a repair and replacement reserve . . . to defray the costs . . . of any necessary repairs, replacements and capital improvements to the [Denver Hotel], as determined by [Woolley Denver]." The funds in the reserve "shall be disbursed" within ten business days to

pay "the costs of necessary repairs, replacements and/or capital improvements" to the Denver Hotel "[s]o long as no uncured Event of Default exists" under the Loan Agreement.

50.     In May 2018, the balance of the reserve was approximately $252,000. Yet, despite Woolley Denver's repeated requests for the Bank to release sufficient (and readily available) funds from that reserve to pay the Contractor, the Bank improperly refused to do so unless and until Woolley Denver agreed to execute the Bank's proposed Loan Covenant Waiver Agreement. Because Woolley Denver refused to succumb to the Bank's pressure tactics, it was unable to use those reserve funds to pay the Contractor, which subsequently filed a mechanic's lien against the Denver Hotel.

## G.     The Bank Threatens To Declare A Default Under The Loan Agreement Based On Threats And Material Misrepresentations.

51.     On July 2, 2018, the Bank sent written notice to Woolley Denver of four purported "Events of Default" under the Loan Agreement and demanded that Woolley Denver cure those alleged defaults by the end of the month to preclude the Bank from invoking its harsh default remedies under the Loan Agreement.

52.     Those four purported defaults, in the order they were specified by the Bank, were: (i) contrary to section 7.28 of the Loan Agreement, Woolley Denver purportedly incurred $300,000 of indebtedness from Robert Jr. without the required consent of the Bank; (ii) contrary to section 7.29 of the Loan Agreement, a mechanic's lien was filed against the Denver Hotel; (iii) contrary to section 7.33 of the Loan Agreement, Woolley Denver was not in compliance with the DSCR Covenant; and (iv) contrary to section 7.06(c) of the Loan Agreement, Woolley Denver purportedly failed to timely provide required financial reports to the Bank.

53.     Woolley Denver did not violate section 7.29 of the Loan Agreement. As stated above, in March 2018, to preserve the value of the Denver Hotel, Woolley Denver had to hire the

Contractor to install new boilers at the Denver Hotel. At the time payment was due, there were more than sufficient funds in the replacement reserve fund to pay the Contractor. The Bank, however, refused to release those funds, contending that Woolley Denver was in default of the DSCR Covenant in section 7.33 of the Loan Agreement, but Woolley Denver was not in default.

54.     The Bank also erroneously contended that Woolley Denver was in default under section 7.28 of the Loan Agreement because Robert Jr. loaned $300,000 to Woolley Denver. Section 7.28 provides that until the Loan is paid in full, "no debt shall be incurred without the written consent of the Lender if an Event of Default has occurred and is continuing." Based on the fact that no default existed when Robert Jr. loaned the money to Woolley Denver, section 7.28 was not an issue.

55.     The Bank also erroneously contended that Woolley Denver violated section 7.06 of the Loan Agreement because it failed to provide certain financial reports. That is not true. Notably, the Bank has never specified the reports it contends Woolley Denver failed to provide.

56.     Mr. Woolley has worked hard to provide all required financial information to the Bank. He also has spent substantial time, money, and effort communicating with the Bank about the operations of the Denver Hotel, his plans for the hotel, and the financial forecasts for the hotel. To that end, on numerous occasions, he has invited representatives of the Bank to visit the property and meet the managers and employees of the hotel.

57.     The Bank proposed that if Woolley Denver were unable or unwilling to cure those four purported defaults, it would "offer an accommodation" to Woolley Denver based on the following, non-negotiable terms: Woolley Denver must agree to either "right size the Loan by paying it down to a 1:1 coverage ratio after re-amortization," or refinance the Loan by December 31, 2018. In exchange, the Bank would release sufficient reserve funds to satisfy the

mechanic's lien, consent to the $300,000 indebtedness (which must be subordinated to the Loan), and allow Woolley Denver to incur a flat management and consulting fee of $200,000 a year.

58.     On July 17, 2018, the Bank prepared and forwarded the "Forbearance and Consent Agreement" to Woolley Denver for execution.

59.     However, contrary to the Bank's contentions and as further discussed below, the Loan Agreement did not permit the Bank to declare Woolley Denver in default based on the DSCR Covenant.   Nevertheless, the Bank wrongfully refused to release reserve funds to pay the Contractor based on the purported default, which caused the Contractor to file a mechanic's lien against the Denver Hotel.

**H.     Based On The Bank's Threats And Material Misrepresentations, Plaintiffs Believed That They Had No Choice But To Accept A Bad Deal.**

60.     On Wednesday, August 1, 2018, Woolley Denver informed the Bank that it would not execute the Forbearance and Consent Agreement.   Woolley Denver also reiterated its commitment to reach a mutually beneficial business solution and made several proposals to resolve the Bank's various concerns.

61.     At approximately 3:00 p.m. CDT on Thursday, August 2, 2018, the Bank responded by demanding that Woolley Denver and the Guarantors execute the Forbearance and Consent Agreement by 5:00 p.m. MDT on Friday, August 3, 2018, or it would invoke its default remedies under the Loan Agreement beginning on Monday, August 6, 2018.

62.     Given the Bank's threats and material misrepresentations concerning the purported defaults under the Loan Agreement, on Saturday, August 4, 2018, Plaintiffs had no choice but to execute the Forbearance and Consent Agreement prepared by the Bank to preclude the Bank from destroying Plaintiffs' investment in the Denver Hotel.   The Forbearance and Consent Agreement is attached hereto as Exhibit B.

63.   In the Forbearance and Consent Agreement, Woolley Denver and the Guarantors were required to acknowledge and agree their purported failure to comply with sections 7.29, 7.33, and 7.06(c) of the Loan Agreement are "Events of Default" under section 8 of the Loan Agreement; all outstanding amounts owed by Woolley Denver to the Bank under the Loan Agreement are due and owing without any defense, right of setoff, or counterclaim; and the Bank has the immediate right to exercise all its default rights and remedies under the Loan Agreement. Woolley Denver and the Guarantors were also required to provide a general release to the Bank, acknowledge and agree they have no existing defenses to the enforcement of the Loan Agreement, and waive any such defenses in any event.   Further, Woolley Denver and the Guarantors were required to agree that all the representations made in the purported agreement are "true and correct," and the making of any "materially false" representation therein would constitute a default entitling the Bank to immediately exercise all its rights and remedies thereunder and in the Loan Agreement.   Again, Mr. Woolley, now 84 years old, signed the agreement for Plaintiffs.

64.   For its part, the Bank agreed to "temporarily forbear" from exercising its remedies under the Loan Agreement based on Woolley Denver's purported default under the DSCR Covenant (section 7.33 of the Loan Agreement).   That temporary forbearance, however, will immediately terminate on the earlier of either the occurrence of another default under the Loan Agreement or the Forbearance and Consent Agreement, or December 31, 2018.   Upon the termination of that temporary forbearance, the Bank will be entitled to pursue all its rights and remedies for Woolley Denver's purported then-existing default under the DSCR Covenant – unless, as of that termination date, Woolley Denver either has "fully cured" that purported

default "by paying down the principal balance of the Loan" or otherwise achieving a ratio of 1.00:1.00 after dividends and distributions, or has repaid the Loan in full.

65.     In addition, the Bank agreed to "temporarily forbear" from exercising its default remedies under the Loan Agreement based on the purported financial reporting default under section 7.06(c) of the Loan Agreement; agreed – notwithstanding its purported right to withhold such funds under section 3.03 of the Loan Agreement – to release up to $140,000 to satisfy the mechanic's lien filed against the Denver Hotel; and consented to the payment of a management and consulting fee of $200,000 per year, payable in equal monthly installments, but such consent would be immediately revoked upon the occurrence of another default under the Loan Agreement or the Forbearance and Consent Agreement.

66.     The Forbearance and Consent Agreement provides that it does not "amend, supplement or modify" the Loan Agreement or the parties' rights and obligations thereunder.

## I.     Plaintiffs Execute The Forbearance And Consent Agreement Based On The Bank's Misrepresentation And Threats.

67.     To coerce Plaintiffs into executing the Forbearance and Consent Agreement, the Bank misrepresented and threatened that Woolley Denver was in default under the Loan Agreement.

68.     Despite the Bank's misrepresentations and threats to the contrary, Woolley Denver was not in default under section 8(d) of the Loan Agreement.

69.     As stated above, the DSCR Covenant of section 7.33 is entitled "Dividends and Distributions" and provides that Woolley Denver:

> shall maintain a Debt Service Coverage Ratio of at least a 1.25:1.00 prior to and a Debt Service Coverage Ratio of at least 1:00:1:00 after dividends and distributions. The ratio shall be measured annually upon receipt of a Certified Public Accountant's prepared audited financial statements and shall be defined as the EBITDA/annual principal and interest payments required to amortize the Loan (EBITDA less dividends and distributions in case of post coverage).

70.     Section 8(d) of the Loan Agreement provides that an "Event of Default" occurs when a covenant:

> is not performed, observed or otherwise satisfied within a reasonable period of time after receipt of written notice thereof from Lender, which period of time shall not exceed thirty (30) days unless, due to the nature of the obligation required to be performed by Borrower it cannot, within the reasonable means of Borrower . . ., be performed in such 30-day period, in which case no default shall occur as long as Borrower promptly commences and thereafter diligently continues to pursue the satisfaction of such obligation.

71.     Woolley Denver was not in default under sections 7.33 and 8(d) of the Loan Agreement because it continued to diligently pursue compliance with the DSCR Covenant after the Bank's written notice of default on July 2, 2018. However, it is not "within the reasonable means" of Woolley Denver to satisfy that covenant within 30 days because section 7.33 provides for the ratio to be "measured annually." Accordingly, Woolley Denver cannot be in default because it is diligently pursuing the satisfaction of the DSCR Covenant.

72.     Woolley Denver also was not in default under section 7.29 of the Loan Agreement because the Bank's prior material breaches of its obligations under section 3.03 of the Loan Agreement caused the mechanic's lien to be placed on the Denver Hotel. This situation existed because the Bank improperly refused to timely release readily available reserve funds to pay the Contractor for necessary repairs to the hotel based on its misrepresentations that Woolley Denver was in breach of the DSCR Covenant, resulting in the mechanic's lien being filed against the hotel. Thus, the Bank's prior material breaches under section 3.03 of the Loan Agreement excused Woolley Denver's obligation to comply with section 7.29 of the Loan Agreement.

73.     In addition, Woolley Denver was not in default under section 7.06(c) under the Loan Agreement because the Bank timely received all required financial reports. Indeed, on August 1, 2018, Woolley Denver asked the Bank to identify the purportedly missing financial reports so they could be resent to the Bank. On August 2, 2018, the Bank threatened to invoke

its harsh default remedies but refused to identify any such missing financial reports. Instead, the Bank renewed its assertion that Woolley Denver was not in compliance with the DSCR Covenant based on "the financial reports recently submitted by" Woolley Denver.

74.     Finally, Woolley Denver was not in default under section 7.28 of the Loan Agreement because no other defaults existed. As stated above, the prohibition contained in section 7.28 applies only if another default exists. In any event, on August 1, 2018, the Bank was informed that the $300,000 loan made to Woolley Denver by Robert Jr. would be recharacterized as a transfer that was not made to Woolley Denver and, in any event, Woolley Denver would not be obligated to repay those funds until after full repayment of the Loan.

## J.     **The Damage Done**

75.     The Bank's threats and material misrepresentations wrongfully forced Plaintiffs to execute the Forbearance and Consent Agreement. As a result, even though Woolley Denver was not in default under the Loan Agreement, the Bank wrongfully extracted releases and additional remedies from Plaintiffs that should be declared invalid and unenforceable.

76.     In addition, the Bank's misconduct caused Plaintiffs to incur damages. Woolley Denver has incurred damages to its reputation in the hotel industry and with other financial institutions, adversely affecting the performance of the Denver Hotel and impairing its ability to refinance the Loan. Mr. Woolley, who is 84 years old, has suffered mental anguish based on the Bank's deliberate efforts to threaten the viability of the Denver Hotel – a valuable, income-producing asset for the benefit of his descendants – and the assets of the Trust. Plaintiffs seek to be compensated for their injuries.

## V.

## CAUSES OF ACTION

A.    **Count I:   Request For Declaratory Relief That The Forbearance And Consent Agreement Is Invalid And Unenforceable, In Whole Or In Part**

77.    Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

78.    An actual, substantial, and justiciable controversy exists between Plaintiffs and the Bank concerning the validity and enforceability of the Forbearance and Consent Agreement.

79.    Section 8(d) of the Loan Agreement states that an "Event of Default" occurs only after: (i) Woolley Denver fails to duly and punctually perform any covenants contained in the Loan Agreement; (ii) the Bank gives Woolley Denver written notice that it is not performing a covenant in the Loan Agreement; and (iii) Woolley Denver satisfies the covenant within 30 days or, if satisfaction within 30 days is not possible due to the nature of the covenant, Woolley Denver promptly commences and diligently continues to pursue the satisfaction of the covenant.

80.    The Bank did not comply with, and was aware of its non-compliance with, the requirements of section 8(d) when it declared Woolley Denver in default of the Loan Agreement. The Bank is, therefore, aware that Woolley Denver is not and has never been in default of the Loan Agreement.

81.    Nevertheless, the Bank intentionally and falsely conveyed to Woolley Denver that it was in default so Plaintiffs would rely on the Bank's threats and misrepresentations and execute the Forbearance and Consent Agreement.

82.    Plaintiffs detrimentally relied on the Bank's misrepresentations regarding Woolley Denver's default in executing the Forbearance and Consent Agreement.

83.     The Bank's intentional misrepresentations and its failure to release funds as required under the Loan Agreement equitably estop it from contending that Woolley Denver was not in compliance with the DSCR Covenant or section 7.29 of the Loan Agreement.

84.     When they entered into the Forbearance and Consent Agreement, Plaintiffs did not receive any consideration. The Bank's alleged temporary forbearance of its default remedies cannot constitute consideration because Woolley Denver was not in default under the DSCR Covenant at the time of execution of the Forbearance and Consent Agreement.

85.     Furthermore, the Forbearance and Consent Agreement is unconscionable because Woolley Denver was not in default under the Loan Agreement, the Loan was more than secure as a result of the value of the Denver Hotel as collateral and the guaranty provided by the Guarantors, the Bank caused the mechanic's lien to be filed against the Denver Hotel, and the Bank improperly reaped additional rights and remedies in connection with the Loan.

86.     Accordingly, Plaintiffs request a judgment declaring that the Forbearance and Consent Agreement is: (i) voidable because Plaintiffs executed it under duress; (ii) invalid and unenforceable because the Bank procured Plaintiffs' execution of that agreement through material misrepresentations on which Plaintiffs justifiably relied and, therefore, their assent to the purported agreement can be rescinded and the doctrine of equitable estoppel precludes the Bank from enforcing it; and (iii) invalid and unenforceable because it lacks consideration and is unconscionable.

**B.      Count II:   Request For Declaratory Relief That The Bank Is Not Permitted To Enforce Various Provisions In The Forbearance And Consent Agreement**

87.     Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

88.     Assuming the Forbearance and Consent Agreement is valid and enforceable, an actual, substantial, and justiciable controversy exists between Plaintiffs and the Bank concerning the respective rights and duties of the parties under that agreement.

89.     The Forbearance and Consent Agreement provides that it does not "amend, supplement or modify" the Loan Agreement or the parties' rights and obligations thereunder. Therefore, section 8(d), which controls the Bank's ability to declare an "Event of Default" under the Loan Agreement, also controls any declaration by the Bank of an "Event of Default" under the Forbearance and Consent Agreement.

90.     The parties dispute whether the Bank's failure to comply with the requirements of section 8(d) of the Loan Agreement equitably estops it from invoking any default remedies for Woolley Denver's failure to comply with the DSCR Covenant and whether such invocation of its default remedies would be unconscionable.

91.     The parties further dispute whether the Bank would either be in material breach of the Loan Agreement or in breach of its implied covenant of good faith and fair dealing in the Loan Agreement if, upon the termination of its temporary forbearance, it invokes its default remedies for Woolley Denver's failure to comply with the DSCR Covenant without first complying with the requirements of section 8(d) of the Loan Agreement.

92.     The parties also dispute whether, because of either equitable estoppel or unconscionability, the Bank can declare an "Event of Default" because the Forbearance and Consent Agreement contains a "materially false" representation that Woolley Denver is in default under the Loan Agreement (when it is not in default, as previously discussed).

93.     Accordingly, Plaintiffs request a judgment declaring their ongoing rights and obligations under the Forbearance and Consent Agreement, including that: (i) the Bank cannot

declare a default based on a failure to adhere to the DSCR Covenant so long as Woolley Denver continues to timely and fully make its monthly Loan repayments; (ii) the Bank must comply with the notice and opportunity-to-cure provisions outlined in section 8(d) of the Loan Agreement prior to invoking any default remedies; and (iii) the Bank cannot declare an "Event of Default" because the Forbearance and Consent Agreement contains the "materially false" representation that Woolley Denver is in default under the Loan Agreement.

## C.   Count III:  Breach Of Contract

94.     Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

95.     Woolley Denver hired the Contractor to repair leaks in two boilers in order to perform its obligation under the Loan Agreement, which is a valid and enforceable contract, to maintain, repair, and preserve in good working order and condition the Denver Hotel. Thereafter, in May 2018, Woolley Denver requested that the Bank release sufficient reserve funds to pay the Contractor.

96.     Under section 3.03 of the Loan Agreement, the Bank is required to release reserve funds within ten business days so long as there is no uncured "Event of Default."  When Woolley Denver requested that the Bank release the reserve funds to pay the Contractor, no "Event of Default" was in existence, much less an uncured "Event of Default."

97.     The Bank breached its obligations under section 3.03 of the Loan Agreement by failing to timely disburse sufficient reserve funds to pay the Contractor and satisfy the Contractor's mechanic's lien.

98.     The Bank willfully and wantonly breached its obligations under section 3.03 of the Loan Agreement when it purposefully and without legal justification or excuse refused to timely disburse sufficient reserve funds first to pay the Contractor and then to satisfy the mechanic's lien filed against the Denver Hotel.

22

99.     As a result of the foregoing breaches by the Bank, Plaintiffs have been damaged in an amount to be proven at trial.

**D.     Count IV: Breach Of Implied Covenant Of Good Faith And Fair Dealing**

100.     Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

101.     The Bank breached its implied duty of good faith and fair dealing by improperly refusing to timely release sufficient reserve funds first to pay the Contractor, and then to satisfy the mechanic's lien filed by the Contractor against the Denver Hotel.

102.     The Bank improperly contended that Woolley Denver was in default under the DSCR Covenant (when Woolley Denver was not) so it could refuse to release the reserve funds and apply additional pressure on Woolley Denver to execute first the Loan Covenant Waiver Agreement and then the Forbearance and Consent Agreement.

103.     The DSCR Covenant is generally intended to provide assurances to the Bank that Woolley Denver has the ability to make monthly Loan repayments in full and on a timely basis. Such assurances, however, are unnecessary because, notwithstanding Woolley Denver's alleged non-compliance with the required ratio in the DSCR Covenant, every monthly repayment of the Loan has been made timely and in full, the Loan is secured by the Denver Hotel as collateral, and the Guarantors have guaranteed the repayment of the Loan.

104.     As a result of the foregoing breaches by the Bank, Plaintiffs have been damaged in an amount to be proven at trial.

**E.     Count V: Fraud**

105.     Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

106.     As detailed above, the Bank made material misrepresentations to Plaintiffs concerning the Loan Agreement, including that Woolley Denver was in default under the Loan Agreement.

107. The Bank made those misrepresentations with the intent to mislead Plaintiffs.

108. Plaintiffs justifiably and reasonably relied on the Bank's misrepresentations to their detriment.

109. Plaintiffs have been damaged as a result of the Bank's wrongful conduct.

110. Because the Bank acted willfully and maliciously, Plaintiffs also seek an award of exemplary or punitive damages.

**F.   Count VI:  Intentional Infliction of Emotional Distress**

111. Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

112. As detailed above, the Bank engaged in extreme and outrageous conduct.

113. The Bank intentionally caused Mr. Woolley severe emotional distress based on its wrongful conduct.

114. As a direct and proximate result of the Bank's misconduct, Mr. Woolley has suffered substantial injuries, including severe emotional distress.

115. As a result, Mr. Woolley has been damaged in an amount to be proven at trial.

116. Because the Bank's actions were willful and malicious, Mr. Woolley is also entitled to an award of exemplary or punitive damages.

**G.   Count VII:  Attorneys' Fees**

117. Plaintiffs incorporate herein the allegations set forth in the preceding paragraphs.

118. Pursuant to section 9.03 of the Loan Agreement and section 6 of the Guaranty, the prevailing party in this action is entitled to recover their reasonable attorneys' fees and costs. Accordingly, Plaintiffs seek the recovery of their reasonable attorneys' fees and costs to prosecute this suit.

## VI.

## DEMAND FOR JURY TRIAL

119.    Plaintiffs request a trial by jury on all claims and issues to which they are entitled to a jury trial.

## VII.

## REQUEST FOR RELIEF

120.    Based on the foregoing, Plaintiffs respectfully request that the Court enter a final judgment for Plaintiffs and against the Bank that awards Plaintiffs the following relief:

a.    a declaratory judgment that the Forbearance and Consent Agreement is voidable or invalid and unenforceable;

b.    alternatively, a declaratory judgment that the Bank is not entitled to enforce various provisions in the Forbearance and Consent Agreement;

c.    their actual, compensatory, consequential, exemplary, and punitive damages in an amount to be proven at trial;

d.    reimbursement of their reasonable attorneys' fees incurred in this action;

e.    their costs of court;

f.    pre-judgment and post-judgment interest at the highest lawful rate; and

g.    such other relief, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

**WILLIAM A. COHAN, P.C.**

By:   */s/ William A. Cohan*
    William A. Cohan
    State Bar No. 7426
    bill@williamacohan.com

    P.O. Box 3448
    Rancho Santa Fe, CA 92067
    Telephone: (858) 832-1632
    Facsimile: (858) 832-1845

    -and-

    William A. Brewer III (*Bar admission to be filed*)
    State Bar No. 02967035
    wab@brewerattorneys.com
    Michael J. Collins (*Bar admission to be filed*)
    State Bar No. 00785493
    mjc@brewerattorneys.com
    Robert M. Millimet (*Bar admission to be filed*)
    State Bar No. 24025538
    rmm@brewerattorneys.com

    BREWER ATTORNEYS & COUNSELORS
    1717 Main Street, Suite 5900
    Dallas, Texas 75201
    Telephone:  (214) 653-4000
    Facsimile:  (214) 653-1015

    **ATTORNEYS FOR PLAINTIFFS
    WOOLLEY'S CLASSIC SUITES-DENVER,
    LLC, AND ROBERT EDWARD WOOLLEY,
    INDIVIDUALLY AND AS TRUSTEE OF THE
    ROBERT EDWARD WOOLLEY FAMILY
    TRUST**

# EXHIBIT A

<u>LOAN AGREEMENT</u>

between

**WOOLLEY'S CLASSIC SUITES-DENVER, LLC, AS BORROWER**

and

**FIRST NATIONAL BANK, AS LENDER**

Dated as of December 16, 2015

Table of Contents

# TABLE OF CONTENTS

Page

SECTION 1.      DEFINITIONS..................................................................................1

  1.01.   Specific Definitions. ..............................................................................1
  1.02.   Certain Other Terms. ...........................................................................10

SECTION 2.      THE LOAN...................................................................................10

  2.01.   Loan/Disbursements.. ..........................................................................10
  2.02.   Interest Rate. ......................................................................................11
  The Loan shall bear interest at the interest rates stated in the Note....................11
  2.03.   Late Charge. .......................................................................................11
  2.04.   Terms of Payment. ..............................................................................11
  2.05.   Prepayment. ........................................................................................11
  2.06.   Payments. ...........................................................................................12
  2.07.   Use of Proceeds....................................................................................12
  2.08.   Payment Application Date. ....................................................................12
  2.09.   Acceleration on Sale or Encumbrance......................................................12
  2.10.   Time of Essence. ..................................................................................12
  2.11.   Recordkeeping. ....................................................................................12
  2.12.   Security. .............................................................................................13

SECTION 3.      RESERVES..................................................................................13

  3.01.   Reserves. ............................................................................................13
  3.03.   Replacement Reserve............................................................................14

SECTION 4.      SECURITY ..................................................................................15

  4.01.   General Security...................................................................................15

SECTION 5.      REPRESENTATIONS AND WARRANTIES.......................................15

  5.01.   Organization, Powers, Etc.....................................................................15
  5.02.   Single Purpose Entity............................................................................16
  5.03.   Authorization of Borrowing, Etc. ...........................................................16
  5.04.   Consents and Approvals. .......................................................................16
  5.05.   Litigation.............................................................................................16
  5.06.   Compliance with Law. ..........................................................................16
  5.07.   Financial Statements. ...........................................................................16
  5.08.   True and Correct Information. ................................................................17
  5.09.   Loan Not for Purpose of Margin Stock.....................................................17
  5.10.   Loan Not to Acquire a Security. .............................................................17
  5.11.   Licenses; Investigations; Compliance......................................................17

121666926v5 0979692

Table of Contents
(continued)

Page

5.12.   Intended Use of the Facilities. ...................................................................18
5.13.   No Usury. ...............................................................................................18
5.14.   Participation of Managers, Officers and Employees. ...............................18
5.15.   Status of the Borrower. ...........................................................................18
5.16.   Agreements. ...........................................................................................18
5.17.   ERISA. ...................................................................................................19
5.18.   Title to Premises. ...................................................................................19
5.19.   Equipment Leases. ..................................................................................19
5.20.   No Lien on the Premises or Equipment. ..................................................19
5.21.   Environmental Impact Statement ............................................................19
5.22.   Access. ..................................................................................................19
5.23.   Hazardous Substances Representations of the Borrower. ..........................20
5.24.   Intellectual Property. ...............................................................................20
5.25.   Maintenance of Property. .........................................................................20
5.26.   Affiliates. ...............................................................................................20

SECTION 6.      CONDITIONS PRECEDENT .........................................................21

6.01.   Effectiveness of Agreement. ...................................................................21

SECTION 7.      COVENANTS .............................................................................24

7.01.   Existence, Properties, Etc. ......................................................................24
7.02.   Insurance and Bonds. ..............................................................................24
7.03.   Collection of Proceeds. ...........................................................................26
7.04.   Payments of Debt, Taxes, Etc. ................................................................27
7.05.   Restrictions on Transfer. .........................................................................27
7.06.   Financial and Other Information. .............................................................28
7.07.   Hazardous Substances. ...........................................................................29
7.08.   Notice of Litigation. ...............................................................................30
7.09.   Change in Nature of Business. .................................................................30
7.10.   No Defaults. ...........................................................................................31
7.11.   Lien Searches. ........................................................................................31
7.12.   Further Assurances. ................................................................................31
7.13.   ERISA. ...................................................................................................31
7.14.   Notice of Events of Default. ...................................................................31
7.15.   Licenses. ................................................................................................31
7.16.   Conduct of Business. ..............................................................................31
7.17.   Application of Loan Proceeds. .................................................................32
7.18.   Material Effect. .......................................................................................32
7.19.   Inspections/Books and Records. ..............................................................32
7.20.   Compliance with Loan Documents. ..........................................................32
7.21.   Compliance with Governmental Requirements and Laws. ..........................32
7.22.   Regulations T and X. ..............................................................................33

ii

Table of Contents
(continued)

Page

7.23.   Merger, Consolidation or Transfer of Assets....................................................33
7.24.   Loans or Advances..............................................................................................34
7.25.   Guaranties............................................................................................................34
7.26.   Maintenance of Properties, Etc............................................................................34
7.27.   Location of Borrower's Facilities on Land...........................................................34
7.28.   Additional Indebtedness......................................................................................34
7.29.   Liens....................................................................................................................34
7.30.   Maintain Single Purpose Entity Status...............................................................35
7.31.   Change of Use......................................................................................................36
7.32.   Transfer of Ownership Interests..........................................................................36
7.33.   Dividends and Distributions................................................................................36
7.34.   Continuing Operations........................................................................................37
7.35.   Subordination of Management Fees....................................................................37

SECTION 8.       EVENTS OF DEFAULT................................................................37

SECTION 9.       MISCELLANEOUS.....................................................................40

9.01.   No Waiver; Remedies Cumulative.......................................................................40
9.02.   Notices.................................................................................................................40
9.03.   Fees/Taxes/Attorneys Fees..................................................................................41
9.04.   Indemnification....................................................................................................43
9.05...  Performance on Business Day..............................................................................44
9.06.   Amendments, Waivers, and Administrative Modifications...................................44
9.07.   Successors and Assigns Included in Parties.........................................................45
9.08.   Binding Effect and Assignment/Third Party Beneficiary....................................45
9.09.   Marshalling; Payments Set Aside........................................................................45
9.10.   Section Titles.......................................................................................................45
9.11.   Reliance by the Lender.........................................................................................45
9.12.   Multiple Counterparts..........................................................................................46
9.13.   Invalid Provisions to Affect No Others................................................................46
9.14.   Number and Gender..............................................................................................46
9.15.   Time of Essence...................................................................................................46
9.16.   No Joint Venture...................................................................................................46
9.17.   Estoppel Certificate.............................................................................................46
9.18.   Notice of Change in Location...............................................................................47
9.19.   Renewal or Extension...........................................................................................47
9.20.   Setoff...................................................................................................................47
9.21.   Name and Logo.....................................................................................................47
9.22.   Remedies Cumulative...........................................................................................47
9.23.   Integration; Conflicting Terms............................................................................48
9.24.   Governing Law and Construction.........................................................................48
9.25.   Consent to Jurisdiction; Punitive Damages.........................................................48

121666926v5 0979692

Table of Contents
(continued)

| | | Page |
|---|---|---|
| 9.26. | Jury Trial. | 48 |
| 9.27. | Legal Counsel. | 49 |
| 9.28. | Term. | 49 |
| 9.29. | Actions by Lender. | 49 |

**EXHIBIT LIST**

**EXHIBIT A**      LEGAL DESCRIPTION OF LAND

**EXHIBIT B**      PERMITTED ENCUMBRANCES

**EXHIBIT C**      SCHEDULE OF LITIGATION, ETC.

121666926v5 0979692

# LOAN AGREEMENT

THIS LOAN AGREEMENT (the "**Agreement**") is deemed effective as of December 16, 2015, by and between Woolley's Classic Suites-Denver, LLC, a Texas limited liability company (the "**Borrower**"), and First National Bank, a national bank (the "**Lender**").

## RECITALS

WHEREAS, the Borrower is a limited liability company organized under the laws of the State of Texas;

WHEREAS, the Borrower desires to borrow the sum of Twenty-Six Million, Five Hundred Thousand and no/100 Dollars ($26,500,000.00) (the "**Loan**") to refinance debt incurred to acquire a hotel facility commonly known as "Woolley's Classic Suites", located in Aurora, Colorado, and for capital investment into a new property to be constructed in Dallas/Fort Worth, Texas ("**Dallas Project**"); and

WHEREAS, the Lender has agreed to make the Loan to the Borrower for such amount upon the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing Recitals and the terms and conditions set forth below, and for good and valuable consideration the receipt of which is acknowledged, the parties hereto agree as follows:

## SECTION 1.    DEFINITIONS

### 1.01.   Specific Definitions.

As used herein, the following terms shall have the following meanings:

*Accountant*: any Person who is a certified public accountant employed or retained by the Borrower and reasonably acceptable to the Lender.

*Advance*: any payment by Lender to the Borrower of proceeds of the Loan in accordance with the terms hereof.

*Affiliate*: with respect to any Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with the first Person.

*Borrower*: Woolley's Classic Suites-Denver, LLC, a Texas limited liability company, together with any successor or assign permitted hereunder and under all Loan Documents.

*Business Day*: each day other than a Saturday, a Sunday or other day on which commercial banks in the city in which the principal office of the Lender is located is not open for business.

*Closing Date*: shall mean December 16, 2015.

1

121666926v5 0979692

*Collateral*: shall mean all property in which the Lender is granted a security interest, deed of trust interest, lien, pledge, assignment, or which otherwise secures repayment of the Loan and other duties due under the Loan Documents, including but not limited to, the Premises, as defined in the Deed of Trust; provided, however, nothing contained in this Agreement, the Deed of Trust, or any other Loan Document shall grant Lender or any other Person any right, title, or interest including, without limitation, any Lien, in, on, or relating to, the Dallas Project.

*Collateral Proceeds*: all proceeds received from the enforcement of any rights or remedies against all or any portion of the Collateral.

*Debt*: collectively, in respect of Borrower, any of the following:

(a)     all indebtedness of Borrower, whether or not represented by bonds, debentures, notes or securities, for the repayment of money borrowed (whether or not the recourse for payment is available to the whole of the assets of Borrower or only a portion thereof), if and to the extent such obligations would appear as a liability upon a balance sheet of Borrower prepared in accordance with GAAP;

(b)     all deferred obligations of Borrower for the payment of the purchase price of property or assets purchased; all obligations of Borrower representing the balance deferred and unpaid of the purchase price of any property or interest therein or in respect of conditional sales, except any such balance that constitutes a trade payable in the ordinary course of business in connection with obtaining goods, materials or services;

(c)     all guaranties, endorsements, assumptions and other contingent obligations in respect of, or agreements to purchase or otherwise acquire, indebtedness of others; and reimbursement obligations of Borrower with respect to letters of credit and bankers' acceptances or similar credit obligations;

(d)     all obligations under interest rate protection agreements, foreign currency hedges and similar agreements;

(e)     all obligations secured by any mortgage, deed of trust, pledge or lien existing on property owned in whole or in part by the Borrower, whether or not the indebtedness secured thereby shall have been assumed;

(f)     all installment purchase contracts, loans secured by purchase money security interests and lease-purchase agreements or capital leases (including leases of real property), in each case computed in accordance with GAAP;

(g)     any obligation of the Borrower (whether or not classified as indebtedness under generally accepted accounting rules, including an operating lease) entered into for the purpose of directly or indirectly supporting, credit enhancing or paying any Debt of another Person, including any agreement to purchase any asset or obligation and any room rate, occupancy, or operating guaranty; and

(h)     a guaranty or agreement by Borrower (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or

121666926v5 0979692

indirect, primary or contingent, in any manner of any part or all of the obligations of another person of the type described in clauses (a) through (g) above;

provided, however, notwithstanding any indebtedness or obligations (contingent or otherwise) described in clauses (a) through (h) above, the term "Debt" shall not include any indebtedness, obligations or other amounts (whether or not classified as indebtedness under GAAP) if and to the extent that insurance proceeds or any other Collateral Proceeds are or may be made available to Borrower or Lender as a result of any damage or loss caused to or otherwise sustained by any Collateral, or injury or death to any Person or its property.

*Debt Service*: with respect to any outstanding Debt which is not otherwise considered an Operating Expense, for any time period, the aggregate of the payments made or to be made in respect of principal (whether by maturity, purchase or amortization), interest, lease payment, servicing fees, trustee fees, paying agent fees, or similar payments, provided that, with respect to balloon debt, Debt Service shall, be computed on a pro-forma basis on the assumption that the principal of such Debt is retired in equal payments of principal and interest commencing on the date of the incurrence of the balloon debt and ending on the expiration date of the amortization period unless, at the time of computing the Debt Service, there's an existing Event of Default, in which case the Debt Service shall be computed on a pro-forma basis on the assumption that the principal of such Debt is retired in equal payments of principal and interest commencing on the original date of the incurrence of the balloon debt and ending on the assumed maturity date of such Debt, and provided further that Debt Service of any Debt constituting a guarantee or similar contingent liability shall be determined by reference to the Debt Service of the Debt guaranteed thereby.

*Debt Service Coverage Ratio*:  with respect to any period, the ratio of: (i) EBITDA (ii) principal and interest on the amortized Loan.

*Deed of Trust*: that certain Deed of Trust, Security Agreement, Assignment of Rents and Leases, and Fixture Filing of even date herewith executed by the Borrower in favor of the Lender.

*Default*:  the occurrence of any event that, with the passage of time, notice, or both, would if not cured constitute an Event of Default hereunder.

*Default Rate*: the meaning given to such term in [Section 2.02(b)].

*EBITDA*:  Earnings before interest, taxes, depreciation and amortization.

*Environmental Audit*: means that certain Phase I Environmental Site Assessment Report dated September 9, 2011, prepared by Partner Engineering and Science, Inc.; Partner Project No. 11-80808.1, and any other environmental assessment with respect to the Premises addressed to and acceptable to Borrower and Lender.

*Environmental Laws*: any applicable international, federal, state, or local statute, law, regulation, order, consent, decree, judgment, permit, license, code, covenant, deed restriction, common law, treaty, convention, ordinance or other requirement relating to public health, safety

3

or the environment, including, without limitation, those relating to releases, discharges or emissions to air, water, land or groundwater, to the withdrawal or use of groundwater, to the use and handling of polychlorinated biphenyls or asbestos, to the disposal, treatment, storage or management of hazardous or solid waste, or Hazardous Substances and any regulation, order, notice or demand issued pursuant to such law, statute or ordinance, in each case applicable to the Premises, including without limitation, if applicable, the following: the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste Amendments of 1984, the Hazardous Materials Transportation Act, as amended, the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1976, the Safe Drinking Water Act, the Clean Air Act, as amended, the Toxic Substances Control Act of 1976, the Occupational Safety and Health Act of 1977, as amended, the Emergency Planning and Community Right-to-Know Act of 1986, the National Environmental Policy Act of 1975, the Oil Pollution Act of 1990, and any similar or implementing federal or state law, and any federal or state statute and any further amendments to these laws providing for financial responsibility for cleanup or other actions with respect to the release or threatened release of Hazardous Substances or crude oil, or any fraction thereof and all rules and regulations promulgated thereunder.

*Equipment*: all personal furnishings, fixtures, equipment and tangible personal property of any nature of which Borrower has any interest, whether such interest be as fee owner, lessee, or otherwise, and wherever located, including but not limited to inventory and equipment relating to maintenance of the Premises, and replacements, attachments and additions thereof and substitutions therefore, and all products and proceeds of the foregoing.

*Event of Default*: an event so defined in [Section 7].

*Facilities*: collectively, the Premises, the Equipment and the Improvements.

*Facilities Enterprise*: shall collectively mean the following:

    (a)    that certain hotel facility commonly known as "Woolley's Classic Suites" located at 16450 East 40th Circle, Aurora, Adams County, Colorado 80011, and

    (b)    all commercial endeavors or other businesses of the Borrower carried on at, on or in connection with the Borrower's Facilities.

*Financing Statements*: one or more financing statements naming Borrower as debtor and perfecting a security interest in the Collateral.

*Force Majeure*: any strikes, acts of God, fire or other casualty, acts of terrorism or war, riot, shortages of labor or material, abnormal weather conditions, governmental permitting delays, changes in any requirements imposed upon by a Governmental Authority, or other similar or dissimilar events or causes beyond Borrower's reasonable control.

*Funding Date*: shall mean the date upon which the Loan is advanced from Lender into escrow with the title company.

121666926v5 0979692

*GAAP*: generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of any date of determination, as further modified and subject to the interpretation and generally accepted business practices established in accordance with the Uniform System of Accounts for the Lodging Industry and the interpretation or enforcement of any of the foregoing by any applicable international, federal, state, or local Governmental Authority, or statute, law, regulation, order, consent, decree, judgment, code, common law, or treaty.

*Governmental Authority*: shall mean any governmental body or regulatory authority exercising jurisdiction over the Premises, including any department or subdivision of the city in which the Borrower's Facilities are located.

*Guarantor*: Each of Robert E. Woolley, an individual resident of the State of Texas as of the date hereof ("**Woolley**"), and Robert Edward Woolley Family Trust (the "**Trust Guarantor**"), collectively, the "**Guarantors**".

*Guarantees*: those certain Guarantees of the Guarantors of even date herewith.

*Hazardous Substance*: any hazardous or toxic material, substance or waste, facility, pollutant or contaminant that is regulated under any statute, ordinance, rule or regulation of any local, state, regional or Federal authority having jurisdiction over the Premises, or its use, including but not limited to any material substance or waste that is: (a) defined as a hazardous substance under any Environment Laws; (b) a petroleum hydrocarbon, including crude oil or any fraction thereof and all petroleum products; (c) polychlorinated biphenyls (PCBs) and urea-formaldehyde; (d) lead; (e) asbestos; (f) flammable explosives; (g) infectious materials; (h) radioactive materials; or (i) defined or regulated as a hazardous substance or hazardous waste under any rules or regulations promulgated under any of the foregoing Environmental Laws; provided, however, that (i) a *de minimis* quantity of hazardous substances such as is customarily utilized in the ordinary course of the Borrower's business, such as common cleaning products and solvents, and (ii) any other quantity of hazardous substances as permitted by and in compliance with all Environmental Laws, to the extent that such compliance with such Environmental Laws does not result in a Material Adverse Effect, which in either case shall not be considered to be a Hazardous Substance for purposes of this Agreement.

*Holder*: the Lender or any Person to which the Note may be transferred.

*Improvements*: the buildings and improvements to the Land heretofore or hereinafter constructed and to be constructed.

*Interest Rate*: the rate set forth in the Note.

*Land*: the parcel of land on which the Facilities are constructed as more fully described in Exhibit A hereto.

*Leases:* has the meaning given to that term in the Deed of Trust.

121666926v5 0979692

*Lender*: First National Bank, a national bank, with an address of 632 Main Street, Rapid City, South Dakota 57701.

*Lender's Representatives*: any employee, agent, representative, consultant, contractor, trustee, receiver or other Person designated or engaged by Lender or any Holder of the Note.

*Lien*: any valid and enforceable security interest, mortgage, deed of trust, pledge, lien, or charge in, of, or on any of the assets or properties of Borrower, whether now owned or hereafter acquired, whether arising by agreement or operation of law, whether or not filed, recorded or otherwise perfected under applicable law, including any option or other agreement to give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

*Loan*: the Loan as defined in [Section 2].

*Loan Documents*: this Loan Agreement, the Note, the Deed of Trust, the Security Agreement, the Financing Statements, the Guarantees, and all agreements, instruments and documents heretofore, herewith or hereafter executed and delivered by Borrower, Guarantors, or any other Person pursuant to, or in connection with, the Loan.

*Manager*:   Woolley's Classic Suites Management, LLC, a Texas limited liability company, with an address of 6600 LBJ Fwy, Suite 195, Dallas, Texas 75240, the Manager under that certain Management Agreement dated May 22, 2014, between Borrower and Manager, as such agreement may be amended or modified from time to time as permitted under the terms of the Loan Documents.

*Material Adverse Effect*: with respect to any agreement, document, or action occurring prior to a Triggering Event, (i) any material adverse effect on the current or future business, operations revenues, expenses, condition (financial or otherwise) of the Facilities or the Facilities Enterprise, (ii) the creation (other than through the creation of a Permitted Encumbrance) of a Lien securing any material liability or obligation of Borrower on any material portion of the Collateral without Lender's knowledge or consent, (iii) a Transfer, other than a Permitted Transfer or through the creation of a Permitted Encumbrance, of any material portion of the Collateral without Lender's knowledge or consent, (iv) a release from the Lien created by the Deed of Trust of any material portion of the Collateral, other than such release caused by the actions of Lender or any of Lender's Representatives, (v) any material reduction in the value of the Collateral caused by Borrower which is not otherwise insured, and (vi) any material adverse effect on the ability of the Lender to enforce their rights or the ability of Borrower to perform its obligations under the Loan Documents, other than due to any act or omission caused by Lender or any of Lender's Representatives, or as a result of an event of Force Majeure.

*Maturity Date*: December 16, 2025; provided, notwithstanding the foregoing, in the event that the Loan is earlier declared due and payable pursuant to the lawful and proper exercise of an acceleration right granted to Lender under any of the Loan Documents, such date upon which the Loan is properly declared due and payable shall constitute the Maturity Date.

*Monthly Payment Date*: the first day of each calendar month, commencing on February 1, 2016.

*Net Insurance Proceeds*: all proceeds of insurance with respect to the Facilities or the Collateral, net of collection costs and expenses.

*Net Operating Income*: with respect to a given period, the gross revenues from operations of the Facilities Enterprise, including but not limited to, all receipts, revenues and rents from the operation of the Facilities Enterprise, whether now existing or hereafter arising, including but not limited to, receipts from lodging, food, beverage, restaurant and other concessions derived therefrom, from the lease or sublease of space within the Facilities, and from any other activities carried on within such Facilities, together with all deposited amounts held by or for the benefit of Lender, including remittances and funds in the Term Debt Service Reserve and the Replacement Reserve, less Operating Expenses.

*Note*: that certain Promissory Note made by the Borrower in favor of the Lender in the amount of Twenty-Six Million, Five Hundred Thousand and no/100 Dollars ($26,500,000.00) dated of even date herewith.

*Note Principal Balance*: at any time with respect to the Note, the total principal sum payable under such Note, reduced by all repayments of principal on the Note.

*Obligations*: each and every debt, liability, and obligation of every type and description which the Borrower may now or at any time hereafter owe to the Lender or pursuant to any Loan Document and any and all documents and instruments executed and delivered by the Borrower to the Lender, related thereto, whether such debt, liability or obligation now exists or is hereafter created or incurred and whether it is or may be direct or indirect, due or to become due, primary or secondary, or absolute or contingent.

*Operating Expenses*: the actual costs of operating the Premises and shall include, without limitation (i) normal, prevailing wages, salaries and leasing commissions to on-site personnel, and fringe benefits and payroll taxes for on-site personnel engaged in the operation of the Premises; (ii) payment of utilities, maintenance supplies, real estate taxes, and assessments (but not income taxes or interest paid on taxes), painting, cleaning, normal maintenance and repairs, landscaping, accounting, auditing and legal fees, interest paid to others on funds held in escrow, approved advertising and promotion fees; (iii) referral fees paid to unrelated third parties; (iv) casualty losses to the extent not covered by insurance; (v) the cost of major repairs which are not capital expenditures; (vi) capital expenditures and costs of capital improvements or capital alterations which Lender has approved; and (viii) any and all other expenses, necessary to the maintenance and operation of the Premises. Operating Expenses shall not include any interest on the Loan, depreciation, expenditures, amortization costs, unapproved capital expenditures, unapproved costs of capital improvements or capital alterations, or any other non-cash costs. Further, at any time in which Manager is not receiving or otherwise entitled to receive its management and consulting fees, then all such fees shall not be included in calculating any portion of the Operating Expenses as described herein.

7

*Permitted Encumbrances*: any of the following:

(a)     a security interest, installment sale contract, financing lease, or similar encumbrance so long as the aggregate principal balances so secured do not exceed $250,000.00 in any Rolling Fiscal Year;

(b)     with respect to fee title to the site of the Facilities, restrictions on alienation and Transfers permitted under the Loan Documents;

(c)     Debts, Liens and other encumbrances permitted under any other Section hereof or under any other Loan Documents;

(d)     clouds on title, title defects or irregularities, utility, access and other easements and rights-of-way, restrictions and exceptions that according to a reasonable written certification from an authorized officer of the Borrower shall not materially interfere with or impair the value, usefulness or integrity of any material portion of the Borrower's Facilities, or the present or intended operations thereof;

(e)     zoning or similar laws not imposed by the Borrower or which according to a reasonable written certification from an authorized officer of the Borrower shall not materially interfere with or impair the value, usefulness or integrity of any material portion of the Borrower's Facilities, or the present or intended operations thereof;

(f)     those items identified on Exhibit B hereto as additional Permitted Encumbrances;

(g)     liens on vehicles and other Equipment;

(h)     inchoate mechanic's liens and any mechanic liens that (i) have been insured or bonded over or otherwise provided for such that the Lien may not be enforced as against any of the Facilities, or (ii) are being diligently contested in good faith by Borrower, or do not materially impair the value of the Facilities or the Collateral or Lender's security interest therein;

(i)     taxes accrued and not due; and

(j)     any item consented to by the Lender.

8

*Permitted Transfer:* any one of the following:

(a)   any Transfer permitted pursuant to Section 7.05, Section 7.23, or which otherwise constitutes a Permitted Encumbrance;

(b)   any Transfer to a guest or occupant of a room within the Facilities, or any Transfer consented to in writing by Lender or any of Lender's Representatives or otherwise permitted under the terms of any Loan Documents;

(c)   any Transfer, issuance or redemption of any direct or indirect interest in Borrower, Guarantor, or in any Person which owns, directly or indirectly, interests in Borrower, Guarantor, or any Affiliate of Borrower or Guarantor (collectively, **"Ownership Interest"**), so long as Woolley or the Trust Guarantor (but not necessary both) remains a Guarantor of the Note;

(d)   after the occurrence of a Triggering Event, the sale or other Transfer of any Ownership Interest by any Person who is a stockholder, partner, member, or other owner of Borrower, Guarantor, or any Person which owns, directly or indirectly, interests in Borrower, Guarantor, or any Affiliate of Borrower or Guarantor;

(e)   any Transfer which occurs upon the death of any individual owning, directly or indirectly, any Ownership Interest of Borrower, Guarantor, or any Person which owns, directly or indirectly, interests in Borrower, Guarantor, or any Affiliate of Borrower or Guarantor, whether such Transfer is to a trust or the estate of such individual and by his or her heirs (by devise or descent); or

(f)   any public offering or Transfer for the purpose of raising capital in which all or a portion of Borrower's Ownership Interest, or any Person who, directly or indirectly, owns or controls an interests in Borrower's or any of Borrower's Affiliate's voting rights or other Ownership Interest, which will be sold or traded to and by the public on a nationally recognized stock exchange or on the "over-the-counter" market (as recognized by the Securities Exchange Act of 1934).

Notwithstanding anything in this Agreement to the contrary, no Transfer shall be a Permitted Transfer absent Lender's written consent (which such consent shall not be unreasonably withheld or delayed) if (i) such Transfer results in Woolley or Trust Guarantor collectively owning less than fifty-one percent (51%) of the Ownership Interest in Borrower, and (ii) if any transferee shall at any time own twenty percent (20%) or more of the Ownership Interest in Borrower such transferee shall enter into a guaranty of the Loan in a form and in substance reasonably acceptable to Lender, but in any event, the terms and conditions of such new guaranty will be generally consistent with the terms and conditions of the Guarantees.

*Person:* any natural person, corporation, partnership, joint venture, firm, association, trust, unincorporated organization, limited liability company, government or governmental agency or political subdivision or any other entity, whether acting in an individual, fiduciary or other capacity.

9

*Premises*: the Land, together with the Improvements.

*Regulations*: all state, federal, and local laws, ordinances, rules, regulations and orders pertaining to the operation of the Borrower's Facilities Enterprise, whether now or hereafter adopted or in effect.

*Required Financial Reports*: means the reports and information in form and substance acceptable to Lender as more particularly stated in [Section 7.06].

*Reserves:* means any funds held by Lender in reserve and to be applied by Lender to the category for which the reserve is established or applied, as provided for in [Article III] or, upon and only during the continuance of an Event of Default, to be applied for any reason, at Lender's sole discretion to any amounts due and payable under the Loan Documents.

*Rolling Fiscal Year*: each period of four consecutive fiscal quarters.

*Security Agreement*: that certain Security Agreement of even date herewith executed by Borrower in favor of Lender.

*Single Purpose Entity:* a Person which complies with the requirements of [Section 6.31].

*Subordination of Management Agreement:* that certain Subordination of Management Agreement of event date herewith executed by Manager in favor of Lender.

*Transfer*: any sale, pledge, assignment, mortgage, deed of trust, encumbrance, or the creation of any security interest, consensual lien, hypothecation, transfer or divestiture, the effect of which is to grant another an interest (including an interest taken as security) in the Collateral or any portion of any thereof, either directly or indirectly. Any change in the legal or equitable title of the Borrower's Facilities or in the beneficial ownership of the Borrower's Facilities, whether or not of record and whether or not for consideration shall be deemed a Transfer.

*Triggering Event*: occurs when (i) a Person, other than Borrower, becomes the owner of all or any portion of the Premises, or (ii) Borrower is no longer in possession of, or permitted to have access to, the Land or any other portion of the Premises, or (iii) Borrower is not in actual control of the day-to-day operations, use, or management of all or any portion of Borrower's Facilities, or (iv) a receiver or trustee is appointed to manage and/or control the Land and related Improvements for the benefit of Lender or any of Lender's Representatives.

### 1.02.   Certain Other Terms.

For purposes of this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with the GAAP.

## SECTION 2.   THE LOAN

**2.01.   Loan/Disbursements.** Subject to the terms and conditions of this Agreement and Borrower's compliance with its obligations to Lender hereunder, Lender shall advance to Borrower and Borrower shall borrow from Lender the Loan.

10

(a)   The Loan is a term loan and not a revolving loan, and any portion of the Principal Balance paid or prepaid by Borrower may not be re-borrowed. The Loan shall be repaid with interest according to the terms of the Note.

(b)   Notwithstanding any other provision herein, the Lender shall have no obligation of any nature to fund all or any portion of the Loan unless all conditions herein as conditions to the effectiveness of this Agreement (whether or not waived in connection with the execution of this Agreement) or the effectiveness of any other Loan Document shall have been satisfied.

### 2.02.   Interest Rate.

The Loan shall bear interest at the interest rates stated in the Note.

### 2.03.   Late Charge.

If any payment required under the Note is not paid within ten (10) days of when it is due, the Borrower shall pay a late fee equal to five percent (5%) of the payment delinquency as provided in the Note. This late charge shall apply individually to all payments past due and there will be no daily pro rata adjustment. This provision shall not be deemed to excuse a late payment or be deemed a waiver of any other rights the Lender may have including the right to declare the entire Note Principal Balance and interest immediately due and payable.

### 2.04.   Terms of Payment.

The Note shall be payable upon the terms set forth in the Note. Amounts due hereunder and under the Note shall be a continuing and unconditional obligation of the Borrower, subject to the terms hereof and the Note. Principal and accrued interest thereon on the Note shall be required to be repaid in installments, as provided in the Note on each Monthly Payment Date to and including the Maturity Date.

### 2.05.   Prepayment.

The Loan may be prepaid in whole or in part at any time upon giving the Lender at least ten (10) days' advance written notice without payment of any premium or fee unless such prepayment occurs in whole or in part within a five (5) year period commencing on the Funding Date, in which case a prepayment fee equal to one percent (1%) of the then outstanding Note Principal Balance shall be due and payable with such prepayment.

Any prepayment must include payment of all accrued but unpaid interest as of such date and the prepayment premium, if any. Any partial prepayments shall be applied to the Note Principal Balance in inverse order of installment payment dates. No prepayment shall postpone the due dates of any other payment due under the Loan. Amounts paid or prepaid under the Note may not be re-borrowed and the Note Principal Balance will not be re-amortized on account of any prepayment unless the Borrower requests Lender's consent to such re-amortization in writing and Lender consents to the foregoing, which consent shall not be unreasonably withheld, and the prepayment is 25% or more of the outstanding Note Principal Balance, in which event Lender shall promptly re-amortize the amount thereafter due under the Note and adjust the

11

monthly amount of the principal and/or interest due on the Note for each subsequent Monthly Payment Date.

Borrowers hereby acknowledge and agree that any partial prepayment made hereunder shall not obligate Lender to release all or any portion of the Collateral for the Loan.

### 2.06.   Payments.

All payments and prepayments by the Borrower of principal of and interest on the Note, and all other fees, expenses, and other obligations under this Agreement payable to the Lender, shall be delivered on or before the date due by check, cashier's check, wire transfer or through automated clearinghouse.

### 2.07.   Use of Proceeds.

The Loan proceeds shall be used to refinance debt incurred to acquire a hotel facility commonly known as "Woolley's Classic Suites", located in Aurora, Colorado, and for investment in or use in connection with the Dallas Project, as necessary.

### 2.08.   Payment Application Date.

Any payments made by check, cashier's check, or wire by or for the account of Borrower delivered to Lender on account of Borrower's indebtedness due under the Note shall be applied by Lender on the date of Lender's receipt, unless such receipt is after 4:00 p.m. (Central time), in which case the application of payment of such funds shall be applied by Lender on the day after Lender's receipt of such payment.

### 2.09.   Acceleration on Sale or Encumbrance.

In the event of a Transfer without the written consent of Lender being first obtained or which is not otherwise a Permitted Transfer, then Lender, at its sole option and upon notice to Borrower, may declare the entire principal balance together with accrued interest, due and payable in full. Any such payment shall be subject to the requirements, if any, in this Note providing for the payment of a prepayment premium in the event of a non-permitted Transfer. A consent by Lender as to any one Transfer shall not be deemed to be a waiver of the right to require consent to a future Transfer. Lender may withhold or condition its consent in its sole discretion.

### 2.10.   Time of Essence.

Time is of the essence. No delay or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or of any other remedy under the Note and the other Loan Documents. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on a future occasion.

### 2.11.   Recordkeeping.

121666926v5 0979692

Lender shall record in its records the date and amount of each Advance, the Loan amount outstanding, and each repayment thereof. The unpaid principal amount recorded shall be rebuttable presumptive evidence of the principal amount of the Loan then owing and unpaid. The failure to record any such amount, or any error in recording any such amount, shall not limit or otherwise affect the obligations of Lender hereunder or under the Note to repay the principal amount of the Loan hereunder, together with all interest accruing thereon.

**2.12. Security.**

To secure payment of all indebtedness secured hereby, Borrower shall execute, cause any party thereto other than Borrower or Lender to execute, and deliver the Loan Documents. The Loan is further secured by all Collateral pursuant to the Security Agreement.

## SECTION 3.   RESERVES

**3.01. Reserves.** At Lender's sole discretion, Lender shall hold back from disbursement of the Loan proceeds an amount sufficient to fulfill the required Reserves under this Agreement and from which Reserves funds shall be thereafter disbursed by Lender as provided in this Agreement. Interest shall accrue and be payable to Lender by Borrower on any Loan proceeds advanced at the Interest Rate set forth in the Note. If the Reserves shall be entirely disbursed, but the costs or expenses for which such Reserves have been established shall not have been fully paid and provided for, Lender shall have the right but not the duty to hold back from any further disbursement of Loan proceeds funds sufficient to re-establish the Reserves in an amount sufficient (in Lender's reasonable judgment) to provide for those costs and expenses thereafter. If in doing so the total of remaining project costs exceed the Loan proceeds remaining to be disbursed, Borrower shall upon notice from Lender deposit with Lender additional amount sufficient to fund the Reserves in the amount of the resulting deficiency as reasonably determined by Lender. Lender shall have no obligation (a) to disburse Reserves if an Event of Default has occurred and is continuing hereunder, or (b) to disburse Reserves for any other purpose or to any other person other than that for which the Reserves was established, provided if an Event of Default has occurred and is continuing hereunder, Lender may disburse the Reserves in its discretion to the payment of the Loan or to any project costs as it may decide. All funds so deposited into Reserves and the interest earned thereon shall secure the indebtedness secured hereby. Borrower hereby grants to Lender a first priority security interest in the Reserves. Upon exhaustion of the Reserves and if further costs are foreseeable, Borrower shall deposit with Lender sums sufficient to replenish the Reserves. Upon the occurrence and during the continuance of an Event of Default, Lender is authorized to draw upon the Reserves without the requirement of an application for payment or other draw certification by Borrower.

**3.02. Term Period Debt Service Reserve.** Borrower shall establish and maintain a Debt Service Reserve Account and Lender shall fund and disburse to itself any funds remaining in the Debt Service Reserve Account remaining in the Reserve as of the Maturity Date plus, on a rolling basis during the period commencing with the Funding Date and continuing to and including the Maturity Date ("**Term Interest Period**"), Lender shall disburse from Loan Proceeds and deposit into the Debt Service Reserve Account an amount sufficient to pay, on a

13

non-Default basis, three (3) months' worth of the principal and interest payments due under the Note in the amount of Four Hundred Forty-Four Thousand and no/100 Dollars ($444,000.00), during the Term Interest Period (the "**Term Debt Service Reserve**"). After two (2) consecutive years of Debt Service Coverage Ratio above 1:25(x), the Term Debt Service Reserve shall be reduced to one (1) month of principal and interest payments, in an amount of One Hundred Forty-Eight Thousand and no/100 Dollars ($148,000.00). The Term Debt Service Reserve shall be deposited into an interest-bearing account maintained by Lender or its nominee promptly following the Funding Date. Borrower shall make monthly payments of Debt Service to Lender as provided in the Note. Lender may also disburse directly to itself at any time funds in the Term Debt Service Reserve in an amount sufficient to pay any prepayments required under the terms of the Loan. Upon the occurrence and during the continuance of an Event of Default, or otherwise at Lender's sole discretion at the written request of Borrower, Lender may disburse to itself funds from the Term Debt Service Reserve to pay Debt Service under the Note as it becomes due and payable and any other required payments under the Loan. Lender is automatically authorized to draw upon the Term Debt Service Reserve without notice to or the consent of Borrower. Upon the occurrence and during the continuance of an Event of Default, including any event of Borrowers' delinquency, Lender may draw on this Debt Service Reserve Account to make payment(s) and Borrower shall be required to replenish the Debt Service Reserve Account equal to the required amount(s) as stated above and as due under the Note within thirty (30) days after receipt of written notice from Lender.

    **3.03. Replacement Reserve.** Commencing on February 5, 2016, and on or before the fifth Business Day of each calendar month thereafter, Borrower shall deposit the sum of: (i) one percent (1%) of monthly net sales for the immediately preceding month for the first three (3) years ending December 31, 2018; (ii) two percent (2%) of monthly net sales for the immediately preceding month for the next two (2) years beginning January 1, 2019 ending December 30, 2020; and (iii) three percent (3%) of monthly net sales for the immediately preceding month for the remaining years beginning January 1, 2021 and for the remaining duration of the Loan ("Annual Sales Deposits"). The Annual Sales Deposits shall be deposited with Lender or a bank designated by Lender so long as Lender has a first perfected security interest in such account, as a repair and replacement reserve (the "Replacement Reserve") to defray the costs ("Replacement Costs") of any necessary repairs, replacements and capital improvements to the Premises, as determined by Borrower. The Replacement Reserve with Lender shall not exceed $1,500,000.00 at any time, and if any funds are withdrawn from the Replacement Reserve, Borrower shall not be required to replace the amount withdrawn but is obligated to continue to deposit monthly amounts into the Reserve Account based on the Annual Sales Deposits percentage rate during the remainder of the year in which Borrower withdrew the funds. Upon the Replacement Reserve reaching $1,500,000.00, and for long as such amount is thereafter maintained, the Borrower's obligations to continue to fund the Annual Sales Deposits shall cease. The funds in the Replacement Reserve shall be disbursed to Borrower upon Lender's receipt of reasonably satisfactory evidence that Borrower has expended such sums for or a request from Borrower for Lender to directly pay from such Replacement Reserve the costs of necessary repairs, replacements and/or capital improvements to the Premises. Such amounts shall be held in an interest-bearing account and all interest shall be added to the Replacement Reserve. So long as no uncured Event of Default exists hereunder or under any other Loan Document, the Replacement Reserve is to be held by Lender for the purposes of providing a source of funds for the payment of Replacement Costs, subject to the following terms and conditions:

14

(a)     Provided Borrower has satisfied the conditions set forth in the following subparagraph (b), Borrower shall be entitled to a disbursement of the Replacement Reserve or such portion thereof for which Borrower has qualified at any time from and after the date hereof; provided that Lender shall not be required to make any disbursement from the Replacement Reserve more often than once in any calendar month;

(b)     Upon receipt by Lender of a written request signed by Borrower, together with evidence reasonably satisfactory to Lender of the completion of such work in a good and workmanlike manner, and together with invoices for the payment of the expenses therefor, Lender shall disburse the portion of the Replacement Reserve for which Borrower has qualified to the party indicated on the request therefor, within ten (10) Business Days after receipt of such request and information; and

(c)     The Replacement Reserve is hereby pledged as additional security for the Borrower's obligations under the Note and the other Loan Documents, shall be held for the purposes set forth in this [Section 3.03], may be held by Lender and shall not be subject to the decision or control of Borrower, except as specifically provided herein. Lender shall not be liable for any act or omission made or taken in good faith and not in violation of this Section in the disbursement or failure to disburse the Replacement Reserve. In making any payments, Lender may rely on any statement, bill or estimate delivered to it by Borrower without inquiry into the validity or accuracy of the same.

## SECTION 4.   <u>SECURITY</u>

### 4.01.   General Security.

To secure payment of all obligations of the Borrower to the Lender hereunder and under the other Loan Documents, the Borrower shall execute and deliver or cause to be delivered the Deed of Trust on the Premises, a Security Agreement, an Assignment of Rents and Leases, and the Fixture Financing Statements as required by Lender.

## SECTION 5.   <u>REPRESENTATIONS AND WARRANTIES</u>

The Borrower represents and warrants to the Lender that, as of the date of this Agreement, and unless otherwise disclosed to Lender in writing:

### 5.01.   Organization, Powers, Etc.

(a)     The Borrower is a limited liability company duly organized and authorized under the laws of the State of Texas;

(b)     the Borrower has full power and authority to own its properties and to carry on its business as presently conducted; and

(c)     the Borrower has the power to execute, deliver and perform the Loan Documents to which it is a party.

121666926v5 0979692

### 5.02.   Single Purpose Entity.

The Borrower is a Single Purpose Entity.

### 5.03.   Authorization of Borrowing, Etc.

The execution, delivery and performance of the Loan Documents and the borrowing hereunder have been duly authorized by all requisite action of the members and the managers of the Borrower, and will not violate either the Member Control Agreement, the Articles of Organization, the Operating Agreement, or Bylaws of Borrower or, to Borrower's current actual knowledge, any provision of law, any order of any court or other agency of government (whether state or federal), or any provisions of any indenture, agreement or other instrument to which either the Borrower is a party or by which it or any of its properties is bound.  The Loan Documents constitute the legal, valid and binding obligations of the Borrower, enforceable against it in accordance with their respective terms (subject to limitations as to enforceability that might result from bankruptcy, insolvency, or other similar laws affecting creditors' rights or contractual obligations generally and applicable principles of equity).

### 5.04.   Consents and Approvals.

The authorization, execution and delivery of the Loan Documents are not and will not be subject to the jurisdiction, approval or consent of, or to any requirement of, registration with or notification to, any federal, state, or local regulatory body or administrative agency.

### 5.05.   Litigation.

Except as disclosed on Exhibit C hereto, there are no actions, suits or proceedings pending, or to the current actual knowledge of the Borrower, overtly threatened against or affecting Borrower, the Premises or the Facilities, which could, if adversely determined, cause a Material Adverse Effect, or involving the validity or enforceability of any of the Loan Documents or the priority of the lien thereof, or any basis, at law or in equity, or before or by any Governmental Authority, and Borrower is not in default with respect to any order, writ, injunction, decree or demand of any court or any Governmental Authority or other governmental agency or instrumentality.

### 5.06.   Compliance with Law.

No consent, approval or authorization of, or registration, declaration or filing with, any Governmental Authority that has not been obtained is required on the part of the Borrower in connection with the execution and delivery of the Loan Documents or the compliance with the terms, provisions or conditions thereof, or, if so required, such consent, approval or authorization has been requested and obtained. The Borrower is not in violation of or subject to any contingent liability on account of any statute, law, rule, ordinance, order, writ, injunction or decree.

### 5.07.   Financial Statements.

The Borrower's and each Guarantor's financial statements that have been presented to the Lender fairly present the financial position of the Borrower and each Guarantor as of such dates

16

and, with respect to the Borrower, to Borrower's current actual knowledge, have been prepared in accordance with GAAP.

### 5.08.   True and Correct Information.

All financial and other information provided to the Lender by or on behalf of the Borrower in connection with the Borrower's request for the Loan is true and correct in all material respects and, as to projections or valuations, present a good faith opinion as to such projections and valuations.

### 5.09.   Loan Not for Purpose of Margin Stock.

The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T, X and U issued by the Board of Governors of the Federal Reserve System), and no proceeds of the Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

### 5.10.   Loan Not to Acquire a Security.

No proceeds of the Loan will be used to acquire any security in any transaction that is subject to Section 13 and 14 of the Securities Exchange Act of 1934.

### 5.11.   Licenses; Investigations; Compliance.

(a)   **Licenses.**  The Borrower has all requisite power and authority and now holds or will hereafter hold all necessary licenses, authorizations, approvals, permits, consents, privileges, waivers, and certificates (the "**Licenses**") to own and operate the Borrower's Facilities.  The true and complete list of Licenses that Borrower is required to obtain and hold in order to own and operate the Facilities is set forth on [Schedule ___] attached hereto and made a part hereof.  Each such License that is necessary to the operation of the Facilities is validly issued and in full force and effect, and the Licenses constitute in all material respects, all of the authorizations necessary for the operation of the Facilities, in the same manner as it is presently conducted and contemplated to be conducted.  Other than with respect to the Licenses set forth on [Schedule ___] attached hereto, the Borrower has fulfilled and performed all of its obligations with respect to obtaining and maintaining the Licenses and complete and correct copies of all material Licenses have been delivered to, or otherwise been made available for review by, the Lender.  To Borrower's current actual knowledge, no event has occurred that:  (1) results in, or after notice or lapse of time or both would result in, suspension, surrender, failure to renew, revocation or termination of any material License; or (2) result in a Material Adverse Effect.  Borrower, at Borrower's expense, agrees to furnish Lender's counsel copies of all material documents, including but not limited to reports, statements, correspondence, forms, and checklists, produced or issued by a licensing authority, entity, agency or department with respect to Borrower's and the Facilities' licensure.

(b)   **Investigations.**  The Borrower is not a party to and the Borrower does not have any current actual knowledge of any active investigation, notice of violation, order

121666926v5 0979692

or complaint issued by or before any court or regulatory body or of any other proceedings that could in any manner result in suspension, surrender, failure to renew, revocation or termination of any material License or otherwise threaten or adversely affect the validity or continued effectiveness of the Licenses of the Borrower. The Borrower has no reason to believe that any Licenses will not be renewed in the ordinary course. The Borrower has fully cooperated with every regulatory body having jurisdiction over any of the Licenses or the activities of the Borrower with respect thereto, and the Borrower has filed all material reports, applications, documents, instruments, and information required to be filed by it pursuant to applicable laws, rules and regulations.

(c)    **Bonding.** The Borrower has posted all bonds required under its Licenses and all Regulations.

## 5.12.   Intended Use of the Facilities.

The Facilities and the intended and current use thereof for the purpose and in the manner contemplated by this Agreement or any other document related hereto are permitted by and will comply in all material respects with all presently applicable Regulations.

## 5.13.   No Usury.

Intentionally omitted.

## 5.14.   Participation of Managers, Officers and Employees.

No manager, member, officer, or employee of the Borrower is prohibited by law, by regulation, by contract, or by the terms of any License, permit, certificate, approval or consent from participating in the business of the Borrower as manager, member, officer, or employee is the subject of any pending or, to Borrower's current actual knowledge, threatened proceeding, which, if determined adversely, would or could result in such a prohibition.

## 5.15.   Status of the Borrower.

The Borrower is not insolvent (as such term is defined in Section 101(32) of the Bankruptcy Code of 1978, as amended) and will not be rendered insolvent (as such term is defined in Section 101(32) of the Bankruptcy Code of 1978, as amended) by execution of this Agreement, the Note, or any other Loan Document or the consummation of the transactions contemplated hereby or thereby.

## 5.16.   Agreements.

The Borrower is not a party to any agreement or subject to any charter that would result in a Material Adverse Effect on its business, properties or assets, operations or condition (financial or otherwise) of the Facilities Enterprise. To Borrower's current actual knowledge, the Borrower is not currently in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party.

121666926v5 0979692

### 5.17. ERISA.

Each employee benefit plan ("**Plan**") covered by Title IV of the Employee Retirement Income Security Act of 1974 ("**ERISA**") and the rules and regulations thereunder maintained, established, sponsored or contributed to by the Borrower or any member of a group that is under common control with the Borrower (the Borrower's ERISA Affiliates); (i) complies in all material respects with ERISA and the Internal Revenue Code of 1986 (the "**Code**") including without limitation, all applicable funding standards of Part 3 of Subtitle B of Title I of ERISA or Section 412 of the Code; (ii) is solvent; and (iii) is not subject to any termination proceeding. Neither the Borrower nor any of its ERISA Affiliates has any liability under Title IV of ERISA to the Pension Benefit Guaranty Corporation ("**PBGC**") or any other person with respect to any such Plan; and neither the Borrower nor any of its ERISA Affiliates contributes to or has contributed to any multi-employer plan (as defined in Section 4001(a)(3) of ERISA) that is a defined benefit plan.

### 5.18. Title to Premises.

On the Funding Date, the Borrower shall own fee simple title, clear of all encumbrances except Permitted Encumbrances, to the Premises and the mortgage documents will be executed by the Borrower. To Borrower's current actual knowledge, unless otherwise disclosed on any survey provided to Lender, all Improvements situated on the Land are situated wholly within the boundaries of the Land.

### 5.19. Equipment Leases.

Borrower shall have submitted all Leases if applicable of Equipment to the Lender and the Lender shall have found the Leases to be in satisfactory in form and content. All Leases shall be submitted and executed or intended to be executed. The Borrower shall have assigned its interest in the payments on said Leases to the Lender by assignments satisfactory in form and content to the Lender.

### 5.20. No Lien on the Premises or Equipment.

Except for the Permitted Encumbrances, no Lien shall exist on any portion of the Premises and, except for Permitted Encumbrances or as otherwise permitted under the Deed of Trust, no Lien shall exist on any portion of any Equipment.

### 5.21. Environmental Impact Statement.

All required environmental impact statements and environmental assessments, as required by any Governmental Authority or other governmental agency or instrumentality having jurisdiction over the Premises or the construction of the Facilities and the Improvements thereon, have been duly filed and approved.

### 5.22. Access.

The Land fronts a publicly maintained road or street and has or will have legal access to the same through non-cancelable easements or rights-of-way, with the Borrower holding any curb cut permits legally required.

### 5.23. Hazardous Substances Representations of the Borrower.

Except as may have been disclosed in any Environmental Audit, to Borrower's current actual knowledge as of the date hereof: (a) the Premises have never been used by the Borrower, or by any previous Affiliate of Borrower, to generate, manufacture, refine, transport, treat, store, handle or dispose of any Hazardous Substances, other than as permitted by and in compliance with all Environmental Laws, except to the extent that such non-compliance with such Environmental Laws or such use of the Premises would not result in a Material Adverse Effect, and to the current actual knowledge of the Borrower, other than as set forth in any Environmental Audit, no such Hazardous Substances exist on the Premises or in its soil or groundwater, except as permitted by and in compliance with all Environmental Laws; (b) no portion of the improvements on the Premises will be or has been constructed with asbestos, asbestos-containing materials, urea formaldehyde insulation or any other chemical or substance that has been determined to be a hazard to health or the environment to the extent that the Environmental Laws would require investigation and cleanup, or such chemical or substance has been removed; (c) there are not any nor have there been, electrical transformers or other equipment that have dielectric fluid-containing polychlorinated biphenyls (PCBs) located in, on or under the Premises, except as permitted by law and in compliance with all Environmental Laws; (d) the Premises do not now contain any underground storage tanks and any prior underground storage tanks have been removed in accordance with Environmental Laws; and (e) the Borrower has not received nor does it have any actual knowledge of any summons, citation, directive, letter or other communication, written or oral, from any local, state or federal government agency concerning: (i) the existence of Hazardous Substances on the Premises or in the immediate vicinity; or (ii) the releasing, spilling, leaking, pumping, pouring, emitting, emptying, or dumping of Hazardous Substances onto the Premises or into waters or other lands, except to the extent that such existence of Hazardous Substances is contemplated by this Section.

### 5.24. Intellectual Property.

Borrower possesses adequate licenses, including without limitation, licenses related to computer programs, permits, patents, copyrights, trademarks, and trade names, or rights thereto, to conduct its business.

### 5.25. Maintenance of Property.

The Borrower will maintain all Facilities in good working order and condition, reasonable wear and tear and events of Force Majeure excepted, and upon receipt of any applicable permits, Governmental Authority approvals, and insurance proceeds, will make all proper repairs, replacements, additions and improvements thereto.

### 5.26. Affiliates.

Borrower's Affiliates include Woolley and Trust Guarantor.

121666926v5 0979692

# SECTION 6.   CONDITIONS PRECEDENT

### 6.01.   Effectiveness of Agreement.

This Agreement shall become effective upon its execution by the parties hereto.

### 6.02.   Conditions Precedent to Closing.

Borrower shall fulfill each and every of the following conditions precedent and any other such items as Lender may reasonably request, such fulfillment being in form and substance reasonably satisfactory to the Lender, unless the same may be waived in writing by Lender:

(a)   deliver to Lender the Loan Documents, duly executed and approved by the appropriate parties, with all of such documents being in full force and effect with no default thereunder;

(b)   deliver to Lender certificates signed by all the managers of the Borrower as to the incumbency and proper signature of the person or persons authorized to execute and deliver the Loan Documents and any other certificates or documents to be delivered by the Borrower in connection therewith;

(c)   deliver to Lender copies of the following:

1.   resolutions of Borrower authorizing the execution, delivery and performance of the Loan Documents to which Borrower is a party;

2.   copies of all organizational documents of Borrower, including but not limited to, Articles of Organization, Operating Agreement, Bylaws, Member Control Agreements, or other agreements that have substantially the same purpose as the foregoing generally described documents;

3.   copies of all licenses issued or required to be issued by any Governmental Authority to the Borrower in connection with the operation of the Facilities, as set forth in [Schedule ___];

4.   to the extent not identified above in this Section, copies of all other agreements or contracts of the Borrower or any Affiliate of the Borrower concerning the development, financing, equipping or operation of the Facilities, including any off-site improvement or development contracts, any consulting, management, joint venture, partnership, purchase, financing, mortgage, deed of trust, loan or equipment transportation agreement, and any lease, licensing or easement contract;

5.   to the extent not identified above in this Section, copies of all resolutions of the Borrower relating to the Premises or the Loan or the Loan Documents, including those that relate to or may affect any action relating to:

(i)   The powers and authority of the Borrower;

21

(ii)  The development, design, financing, or operation of the Facilities;

(iii)  The Facilities Enterprise, including its present or future financial condition;

(iv)  Real estate;

(v)  Secured financing matters;

(vi)  Other forms of borrowing or pledging of Borrower's assets;

(vii)  Utilities;

(viii)  Building codes;

(ix)  Zoning codes;

(x)  Labor matters;

(xi)  Permits and licenses relevant to the Facilities and the conduct of the operations of the Borrower at the Facilities;

(d)  deliver to Lender a certificate of the manager(s) of the Borrower stating that after giving effect to the Loan, the representations and warranties contained herein are true and accurate in all material respects and that, to the current actual knowledge of Borrower, no Default or Event of Default exists as of the date hereof under the Loan Documents;

(e)  deliver to Lender a copy of the Environmental Audit, if requested by Lender, in form and substance acceptable to Borrower and Lender, certified to Borrower and the Lender, prepared by a Person acceptable to Lender;

(f)  deliver to Lender chattel lien searches covering the name of the Borrower and the Guarantors, current within twenty-one (21) days, reflecting no Liens or encumbrances on the Facilities, or the Collateral, other than Permitted Encumbrances;

(g)  deliver to Lender searches within twenty-one (21) days evidencing no bankruptcies, tax liens, pending lawsuits, or judgments relating to the Borrower, any Affiliate of the Borrower, any Guarantors, or any of their property that are not consented to by the Lender;

(h)  deliver to Lender a commitment to issue a policy of title insurance, in form and substance satisfactory to the Lender, confirming that Borrower will take or currently owns the Land and the Facilities, without liens, encumbrances or restrictions, which, in the opinion of the Lender, adversely affect the anticipated future revenues of any portion of the Facilities or any other encumbrance other than a Permitted Encumbrance, free of any exceptions because of a lack of proper survey  to issues its policy of extended coverage title insurance which (a) names the Lender as insured in the

22

principal amount of the Loan, (b) insures the Deed of Trust to be a valid first lien on the Premise and (c) is free from exception for (i) matters which would be disclosed by a survey or inspection, (ii) mechanics, contractors or material men's liens and lien claims, (iii) rights and claims of parties in possession (other than lessees or hotel occupants approved by Lender), (iv) easements, or claims of easements now shown by the public records, and (v) other exceptions not approved by Lender;

(i)     deliver to Lender proof that all property taxes due with respect to the Collateral, real estate taxes, levied special assessments and all special assessments yet to be levied for improvements which prior to the closing have been authorized by any governmental unit or agency or commences or for which a construction contract has been entered into prior to the closing have been paid;

(j)     deliver to Lender an ALTA land survey of the Land, certified as to accuracy in such form as is necessary for the delivery of the title insurance policy described above, showing the exterior lines of the Premises, the location of all improvements thereon, showing them to be within the exterior lines, showing no easements, rights-of-way or encroachments except such as may be acceptable to the Lender, and shall be certified by a civil engineer or registered surveyor to the Lender and title insurer by name, and the certification shall state that there are no easements, rights-of-ways or encroachments except as shown on the survey;

(k)     deliver to Lender a certificate regarding the Flood Insurance Rate Map Flood Zone designation, if requested by Lender, of the Land;

(l)     deliver to Lender a zoning letter or report stating that the intended use of the Facilities complies with applicable zoning ordinances, and all improvements on the Premises and uses thereof comply with the applicable zoning ordinances and building and use restrictions and codes, and any requirements with respect to licenses and permits necessary for the lawful use and operation of the Premises and any instruments of record affecting the same;

(m)     deliver to Lender the favorable opinion or opinions of legal counsel for the Borrower as to the due and valid existence of the Borrower; and as to the valid and binding nature of and enforceability of all Loan Documents with respect to the Borrower;

(n)     deliver to Lender the favorable opinion or opinions of legal counsel for the Guarantors as to the valid and binding nature of and enforceability of the Guarantees, and as to such other matters as the Lender may require;

(o)     deliver to Lender copies of the insurance certificates for the coverage required by [Section 6.02] hereof;

(p)     deliver to Lender a copy of all feasibility studies prepared with respect to the operation of the Facilities, if any;

(q)     deliver to Lender the most current available financial statements of the Borrower and the Guarantors for the current calendar year and each of the three (3) full

23

fiscal years immediately preceding the current calendar year (if applicable), as well as financials for the Facilities Enterprise, all of the foregoing described financial statements being signed and certified by the Borrower or Guarantors, as applicable;

(r) deliver to Lender a complete set of federal, state, and local tax returns, including Schedule K-1's and all other schedules, for the Borrower and the Guarantors, as applicable for the 2012, 2013, and 2014 calendar years, all of the foregoing described tax returns being signed and certified by and to the current actual knowledge of the Borrower or Guarantors, as applicable; and

(s) deliver to Lender such other documents, instruments, approvals or opinions as the Lender may reasonably request.

## SECTION 7.   COVENANTS

The Borrower covenants and agrees that from the date hereof until payment in full of the principal of and interest on the Loan, unless otherwise permitted under the terms of the Loan Documents or the Lender shall otherwise consent in writing, the Borrower will:

### 7.01.   Existence, Properties, Etc.

Except as otherwise permitted or contemplated herein, so long as any amount remains owing hereunder or under the Loan Agreement, cause to be done all things necessary to preserve and keep in full force and effect its existence as a Single Purpose Entity, and conduct and operate its business with respect to the Facilities as contemplated in the Loan Documents.

### 7.02.   Insurance and Bonds.

The Borrower shall keep the buildings, structures, fixtures, equipment, other equipment, inventory, personal property, and other improvements now existing or hereafter erected or placed on the Premises insured against loss by fire, perils of extended coverage, and such other hazards, casualties, and contingencies as required by Lender in an amount at least equal to the replacement cost of the Premises and in no event less than the unpaid indebtedness secured by the mortgages outstanding at any given time. The policies shall include "all risk" coverage, and shall be reasonably satisfactory in form and substance to Lender. All insurance shall be carried with companies approved by Lender, and policies of Borrowers and renewals thereof shall (i) contain a waiver of defense based on co-insurance, (ii) be constantly assigned and pledged to Lender as additional security, and (iii) have attached thereto standard mortgage and loss payee clauses in form reasonably acceptable to Lender.

If steam boilers or similar equipment for the generation of steam are located in, on or about the Premises, the Borrower shall maintain insurance against loss or damage by explosion, rupture or bursting of such equipment and appurtenances thereto, without a co-insurance clause, in an amount reasonably satisfactory to Lender, and containing a standard mortgage clause in form reasonably acceptable to Lender.

If the Premises or any part thereof is located in a flood hazard area for which flood insurance is available, Borrower shall maintain flood insurance insuring the existing and

24

contemplated improvements on the Mortgaged Properties to the maximum limit of coverage made available, or in such lesser amount as Lender may in writing consent, and containing standard mortgagee and loss payee clauses in form reasonably acceptable to Lender.

Borrower shall maintain comprehensive general liability insurance naming Lender as an additional insured in an amount reasonably acceptable to Lender, insuring against claims arising from any accident or occurrence in or upon the Premises.

All insurance policies shall be issued by companies approved by Lender, and shall provide at least thirty (30) days' notice to Lender prior to cancellation or nonrenewable thereof. Borrower shall provide copies of insurance certificates related to all such insurance policies to Lender.

The Borrower shall obtain and maintain throughout the term of the Loan such insurance and bonds as the Lender may reasonably require with respect to the Facilities in forms of coverage and with insurers reasonably acceptable to the Lender, with a current Best's Insurance Guide rating reasonably acceptable to the Lender, and with the Borrower, and the Lender named as insured, as their interests may appear, naming Lender as loss payee and including a standard form of mortgagee's loss payable clause naming Lender as mortgagee, and also including waiver of subrogation clauses and written agreement by the insurer or insurers therein to give the Lender thirty (30) days' prior written notice of intent to cancel or to change the terms and conditions of the policies, including but not limited to with respect to each of the Borrower and the Facilities, the following specific coverages:

(a) **All Risk Insurance.** All Risk Insurance against loss by fire, lightning and risk customarily covered by Fire and Extended Coverage Insurance, including special cause of loss and flood hazard coverage, and such other hazard insurance as the Lender may require in an amount equal to the full replacement cost of the Facilities with non-contributing mortgagee clauses, stipulated value-agreed amount endorsement, and no co-insurance, and with a maximum deductible of $5,000.

(b) **Public Liability Insurance.** Comprehensive General Liability Insurance covering the legal liability of the Borrower against claims for bodily injury, death or property damage occurring on, in, or about the Facilities with a limit of not less than $1,000,000 per occurrence with a maximum deductible of $5,000 and $5,000,000 in excess liability with a $10,000 retention; automobile liability coverage (including coverage for hired and non-owned vehicles) with a combined single limit of not less than $1,000,000, with a maximum deductible of $5,000; and if liquor is sold on the Premises, Liquor Liability Coverage (Dram Shop coverage) in the minimum amount of (i) $3,000,000 or (ii) amounts as may be required by applicable law, with a maximum deductible of $5,000; hazard insurance liability coverage of $32,100,000 with a maximum deductible of $5,000.

(c) **Business Interruption Insurance.** Insurance covering actual losses in net income plus operating expenses of the Borrower resulting directly from necessary interruption of business caused by risks of direct physical loss of real or personal property constituting part of the Facilities, subject to policy exclusions, less charges and expenses

25

that do not necessarily continue during the interruption of business, for such length of time as may be required with the exercise of due diligence and dispatch to rebuild, repair or replace such properties as have been damaged or destroyed, but not less than six months, with limits equal to at least 100% of the annual Debt Service of the Borrower calculated for the current fiscal year of the Borrower.

(d)  **Construction Liability.** During the making of any alterations or improvements to the Premises, (a) owner's contingent liability insurance covering claims not covered by the general comprehensive insurance referred to above, (b) Worker's Compensation Insurance covering all person engaged in making such alterations or improvements, and (c) comprehensive general contractor's liability insurance (including premises and operations, contractors' protective liability, contractual obligations and products/completed operation) with the exclusion for explosion, collapse and underground property removed, in amounts and coverage of at least $5,000,000 combined single limit.

All hazard and casualty insurance policies maintained by the Borrower pursuant to the foregoing provisions of this Section shall provide that any losses payable thereunder shall be payable to the Borrower, and the Lender, and assigns, as their interests may appear. All property and liability insurance policies maintained by the Borrower, shall (i) include effective waivers by the insurer of all claims for insurance premiums against the Lender, and (ii) provide that any losses shall be payable notwithstanding (a) any act of negligence by the Borrower, or the Lender, by any foreclosure or other proceedings or notice of foreclosure sale relating to the Collateral, or by any release from liability or waiver of subrogation rights granted by the insured. All insurance policies maintained by the Borrower pursuant to the foregoing provisions shall respond on a primary basis relative to any other insurance carried by the Borrower in the event of loss. Insurance terms not otherwise defined herein shall be interpreted consistent with insurance industry usage. At least sixty (60) days prior to the date on which the premiums on each such policy shall become due and payable, the Borrower shall furnish the Lender with proof reasonably satisfactory to the Lender of payment thereof. In the event of loss, the Borrower shall promptly give written notice thereof to the Lender. All proceeds of such insurance are hereby absolutely and unconditionally assigned, and shall be paid, to the Lender for deposit in a separate account maintained by the Lender. Such proceeds shall be applied either (i) to prepayment of the Note, with the remainder, if any, being applied at the Borrower's option, or (ii) if no Event of Default has occurred and is continuing, then at the option of the Borrower to the restoration or repair of the Facilities, without affecting the obligations of the Borrower hereunder. If the Borrower elects to apply any such insurance proceeds to the restoration or repair of the Facilities, the Lender shall deposit the same in a separate account to be disbursed for the costs of replacement or restoration of the damage, making such proceeds available to the Borrower, for such purposes subject to such customary construction disbursing conditions as the Lender shall reasonably impose; provided that if such proceeds are less than $25,000.00, the Borrower shall be entitled to receive, hold and apply such proceeds for such purposes; and in any case, the Borrower shall be obligated to complete the restoration and repair regardless of the amount of such proceeds.

**7.03.  Collection of Proceeds.**

On and after the funding of the Loan, Borrower will reasonably cooperate with the Lender to obtain for the Lender the benefits of any insurance, bonds or other proceeds lawfully or equitably payable to it in connection with the transaction contemplated hereby and the collection of any indebtedness or obligation of the Borrower to the Lender incurred hereunder.

### 7.04.   Payments of Debt, Taxes, Etc.

Borrower shall (a) promptly pay all of its Debt and perform all other obligations with respect to the Facilities and the Facilities Enterprise, including Debt secured by any portion of the Equipment located at or used in connection with the Facilities, or any lease of the same, and including promptly and timely performing all covenants, agreements and promises under the Note and the other Loan Documents, subject, however, to events of Force Majeure; and (b) promptly pay and discharge or cause to be paid and discharged promptly all taxes, assessments, and governmental charges or levies imposed upon it or upon its income and profits, or upon any of its property, before the same shall become in default, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might become a Lien or charge upon any of such properties; provided, however, that the Borrower shall not be required to pay and discharge or to cause to be paid and discharged any such tax, assessment, charge, levy or claim so long as (i) the validity thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves with respect to any such tax, assessment, charge, claim or levy to the extent required by its auditors in order to comply with GAAP, (ii) the non-payment or non-discharge of such tax, assessment, charge, levy or claim does not result in a Lien (other than a Permitted Encumbrance) being imposed against all or any portion of the Premises, or any Collateral.

Upon the occurrence and during the continuance of an Event of Default, at Lender's election, Borrower shall pay, together with and in addition to each monthly installment payment required by the Note, an amount estimated by Lender to be sufficient to enable Lender to pay, at least thirty (30) days before due, all premiums for insurance required by [Section 6.02] hereof and, at least thirty (30) days before penalty attaches, all taxes, assessments, and other similar charges against the Land and the Facilities.  Upon demand of Lender, Borrower will deliver to Lender such additional moneys as are necessary to make up any deficiency in the amount necessary to enable Lender to pay the foregoing.  In the event of a default by Borrower in the performance of any of the terms, covenants, or conditions herein or in the Note, Lender may apply to the Obligations, in such manner as Lender shall determine, any funds of Borrower then in Lender's possession under this Section.  Borrower will pay promptly, when due, any insurance premiums and, before penalty attaches, any taxes, assessments, and similar charges, payment for which has not been provided as hereinbefore contemplated.

### 7.05.   Restrictions on Transfer.

Not effect or permit a Transfer (except a Transfer that creates a Permitted Encumbrance or a Permitted Transfer) without the prior written consent of the Lender; provided that, without the Lender's consent, the Borrower may sell or otherwise dispose of Equipment or other personal property constituting Collateral if and to the extent that (i) such property is promptly replaced with reasonably equivalent property of equal or greater value that is free of any Liens or encumbrances other than the Liens provided for in the Deed of Trust and other than Permitted

Encumbrances or (ii) such property is no longer needed or useful in connection with the operation of the Facilities, and the fair market value of such property at the time of sale or disposal does not exceed $25,000.00 per item or $250,000.00 in the aggregate per calendar year for all items sold or disposed of pursuant to this clause. Upon the Borrower's request, the Lender shall execute and deliver such instruments as may be reasonably necessary to evidence the release of any property sold or otherwise disposed of by the Borrower as permitted by this Section from the lien and security interest created by the Deed of Trust.

### 7.06.   Financial and Other Information.

Borrower shall provide Lender and cause the Guarantors to provide to Lender the following Required Financial Reports and information on a continuing basis during the term of the Loan:

(a)   Beginning with the Fiscal Quarter in which the Closing Date occurs, within thirty (30) days after the end of each Fiscal Quarter, unaudited financial statements of Borrower, which statements shall be prepared in accordance with lodging industry standards for facilities operating under "Woolley's" or "Woolley's Classic Suites", shall be certified as true and correct in all material respects by a financial officer of Borrower, and shall include for the Fiscal Quarter then ended: (i) a balance sheet, (ii) a statement of revenue and expenses comparing actual revenue and expenses to budgeted revenue and expenses, (iii) a statement of cash flows, (iv) the current budget and operating statement, and (v) a census report showing occupancy rates.

(b)   Beginning with the Closing Date and until construction begins on the Dallas Project, Borrower shall cause Guarantors to provide (i) on or before the 10th day of each month commencing after the Funding Date, monthly statements of liquidity to Lender sufficient to evidence that the amount of loan funds distributed as cash out are available for investment into the Dallas Project, and/or (ii) proof of payment (receipts, settlement statement, etc.) showing that funds were invested into, or otherwise used in furtherance of negotiating agreements and/or the performance of work associated with the entitlement, design, financing and/or development of, the Dallas Project, all as determined by Woolley in his sole and absolute discretion. For purposes of this subparagraph, construction shall be deemed to have begun up the earlier to occur of, (A) filing of public record a notice to proceed, (B) the commencement of site grading, excavation work, or any other steps taken to clear or otherwise prepare the land associated with the Dallas Project for construction or the delivery of material for use in construction of any improvements thereon, or (C) the time of inception of a mechanic's lien, as contemplated by Texas Property Code §53.124.

(c)   Beginning with the Fiscal Year in which the Closing Date occurs, within one hundred eighty (180) days after the end of each Fiscal Year of Borrower, audited financial statements of Borrower, which statements shall be prepared in accordance with lodging industry standards for facilities operating under "Woolley's" or "Woolley's Classic Suites", shall be certified as true and correct in all material respects by a financial officer of Borrower and shall include for the Fiscal Year then ended: (i) a balance sheet, (ii) a statement of revenue and expenses comparing actual revenue and expenses to

28

budgeted revenue and expenses, (iii) a statement of cash flows, (iv) the current budget and operating statement, and (v) a census report showing occupancy rates.

(d)   Within one hundred ninety (90) days after the end of each calendar year, financial statements prepared by a certified public accountant of each of the Guarantors, including both personal and trust assets, if separated, in the form and with the attachments as may be reasonably required by Lender from time to time, including disclosure of all material, contingent liabilities, signed by each Guarantor and certified to Lender.

(e)   Within thirty (30) days after the due date, as extended, copies of Borrower's and each Guarantors' federal and state income tax returns for the preceding tax year, including all Schedule K-1s and other schedules referenced in or relating to the tax returns.

(f)   Within forty-five (45) days after the end of each calendar month after the Funding Date, monthly sales, occupancy and Smith Travel Research reports for the Facilities Enterprise for the previous month.

(g)   Within ten (10) days after prepared by Borrower, or received by Borrower if prepared by the Manager, any financial reports with respect to the Facilities required to be provided containing any material information: (i) concerning the prospects of either Borrower's or Guarantors' payment or performance of its other duties when due under the Loan Documents, (ii) which, if known to Lender, would cause Lender to reasonably be insecure with respect to receiving all payments or other performances when due under Loan Documents or with respect to the value of the Collateral, or (iii) which, if known to Lender, would apprise Lender that a material adverse change has occurred or reasonably is expected to occur in Borrower's or Guarantors' financial condition or the value of the Collateral.

All financial statements must be in the form and detail as Lender shall from time to time reasonably request.

**7.07. Hazardous Substances.**

The Borrower shall:

(a)   (i) comply and shall require all occupants of the Premises to comply with all applicable federal, state and local laws, rules, regulations and orders with respect to the discharge, generation, removal, transportation, storage and handling of Hazardous Substances; (ii) remove any Hazardous Substances existing in or on the Premises prior to a Triggering Event in violation of any Environmental Law promptly upon discovery of same, in accordance with applicable laws, ordinances and orders or government authorities having jurisdiction thereof; (iii) pay or cause to be paid all costs associated with such removal; and (iv) indemnify the Lender from and against all losses, claims and costs arising out of the migration of Hazardous Substances from or through the Premises onto or under other properties, other than for any loss, claim or cost arising out of or

29

related to the acts or omissions of Lender or any of Lender's Representatives which occur from and after a Triggering Event;

(b)     keep the Premises free of any lien imposed pursuant to any state, federal, or rule, regulation or order in connection with the existence of Hazardous Substances on the Premises prior to a Triggering Event;

(c)     not install or permit to be installed or to exist in or on the Premises any asbestos, asbestos-containing materials, urea formaldehyde insulation or any other chemical or substance that has been determined to be a hazard to health and environment, except as permitted by and in compliance with all Environmental Laws;

(d)     not cause or permit to exist any release of any Hazardous Substances onto the Premises or into waters or other lands; and

(e)     give all notifications and prepare all reports required by Environmental Laws or any other law with respect to Hazardous Substances existing on, released from or emitted from the Premises.

In the event any authorized and otherwise qualified representative of any Governmental Authority determines at any time prior to a Triggering Event that Hazardous Substances or asbestos-containing materials exist on the Premises and present a health hazard, or removal or containment of the asbestos-containing materials or any other Hazardous Substances from the Premises is required by applicable governmental or regulatory authorities pursuant to applicable laws or regulations, Lender may, in its sole discretion, require the removal or containment of such asbestos-containing materials or any other Hazardous Substances at Borrower's expense. In addition to the Indemnification provision provided in [Section 8.04], Borrower shall specifically indemnify Lender from and against any and all liabilities, claims, demands, costs and expenses, including reasonable attorneys' fees, to the extent resulting from or due to the release or threatened release of asbestos-containing materials or any other Hazardous Substances, which were, or are claimed or alleged to have been located on or removed from the Premises by any person at any time prior to a Triggering Event, but not otherwise. This indemnification agreement shall be binding upon the successors and assigns of Borrower.

**7.08.   Notice of Litigation.**

Give prompt written notice to the Lender of the commencement of any action, suit or proceeding before any court of competent jurisdiction or arbitrator or any governmental department, board, agency or other instrumentality directly affecting the Facilities Enterprise, the Facilities, or to which the Borrower or any of the Guarantors is a party in which an adverse determination results in a Material Adverse Effect, stating the nature and status of such action, suit or proceeding.

**7.09.   Change in Nature of Business.**

Not make any material change in the nature of the business of the Borrower conducted at the Facilities as carried on at the date hereof or as contemplated at the date hereof as previously disclosed in writing to the Lender.

### 7.10.  No Defaults.

Use commercially reasonable efforts to not permit any Event of Default to occur with respect to the Borrower or any Affiliate under the Note or any other Loan Document, unless such Event of Default will not result in a Material Adverse Effect, or unless such Event of Default is being diligently contested in good faith by the Borrower and will not materially impair the value of the Facilities or the Collateral and Lender's security interest therein.

### 7.11.  Lien Searches.

Promptly deliver to the Lender any and all Lien searches as the Lender may request from time to time in connection with the Loan.

### 7.12.  Further Assurances.

From time to time at its expense execute and deliver or endorse any and all instruments, documents, conveyances, assignments and other agreements and writings, make any records, file any notices, and obtain any consents, all as may be necessary or appropriate in connection herewith, that the Lender may reasonably request to cure any defects in the creation, execution and delivery of this Agreement or protect, perfect or enforce the Loan Documents or the rights of the Lender under this Agreement (but any failure of the Lender to request the Borrower to execute, deliver, or endorse any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on any other occasion).

### 7.13.  ERISA.

Comply in all material respects with the Employee Retirement Income Security Act of 1974 to the extent applicable.

### 7.14.  Notice of Events of Default.

Furnish to the Lender as soon as possible and in any event within five (5) Business Days after Borrower has obtained knowledge of the occurrence of an Event of Default, which is continuing on the date of such statement, a statement signed by the Borrower setting forth general details of such Event of Default and the action that the Borrower has taken, is taking or proposes to take to correct the same.

### 7.15.  Licenses.

Obtain and hold all necessary Licenses with respect to the operations of the Facilities.

### 7.16.  Conduct of Business.

Preserve all the rights and privileges necessary or desirable in the normal conduct of the business of the Borrower's Facilities; conduct such business in an orderly, efficient and regular manner; not assign this Agreement or any interest herein or all or any part of any Loan to be

31

made hereunder without the prior written consent of the Lender, except as may be otherwise permitted herein.

### 7.17.   Application of Loan Proceeds.

Use the proceeds of the Loan solely for the purposes set out in [Section 2.07] hereof or as otherwise approved in writing by the Lender, and in no event to use any of the Loan proceeds for personal or illegal purposes.

### 7.18.   Material Effect.

Promptly transmit to the Lender, upon receipt thereof, any written communication received by Borrower that could have a Material Adverse Effect.

### 7.19.   Inspections/Books and Records.

Use best efforts to keep at all times proper books of record and accounts for the Facilities Enterprise, and, upon 3 days written request of the Lender, provide any duly authorized representative of the Lender access during normal business hours to, and permit such representative to reasonably examine, copy or make extracts from, any and all books, records and documents in the Borrower's possession or control relating to the Facilities Enterprise or any of the representations or covenants of the Borrower hereunder or in the Loan Documents (such access to be given promptly upon request in the case of any emergency or a material adverse change in financial condition of the Borrower).

### 7.20.   Compliance with Loan Documents.

Comply with all the terms of the Loan Documents to which it is a party.

### 7.21.   Compliance with Governmental Requirements and Laws.

At all times prior to a Triggering Event Borrower shall:

(a)   subject to events of Force Majeure, comply promptly with all other permits, laws, statues, ordinances, orders, rules, codes, regulations, licenses, authorizations and requirements of all Government Authorities applicable to the Facilities (or their operation), the non-compliance with which could have a Material Adverse Effect, except for such matters that are being contested diligently and in good faith by proper proceedings and where security reasonably satisfactory to the Lender already exists or has otherwise been provided to ensure the continued operation of the Facilities during the pendency of such contest;

(b)   obtain or cause to be obtained as promptly as possible any License and make any filing or registration therewith which at the time shall be required with respect to the performance of its obligations under this Agreement or the other Loan Documents or for the operation of its business as presently conducted or as contemplated by it; and promptly provide written notice to the Lender of the receipt of any written notice of any investigation or charge of violation thereof from any Governmental Authority or of any

121666926v5 0979692

administrative or adjudicative proceedings that could in any manner result in the termination of any License or could reasonably be expected to have a Material Adverse Effect, and in such event shall provide the Lender with such additional reports and information as the Lender may reasonably require.

### 7.22.   Regulations T and X.

Use the net proceeds from the Loan for business purposes as herein expressly provided. None of the transactions contemplated in this Agreement (including, without limitation thereof, the use of proceeds from the Loan) will violate or result in a violation of Section 7 of the Securities Exchange Act of 1934, as amended, or any regulation issued pursuant thereto, including, without limitation, Regulations T, U or X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II. None of the proceeds from the Loan will be used to: (i) purchase any security within the meaning of the Securities Exchange Act of 1934, as amended, or (ii) refinance any borrowing, the proceeds of which were used to purchase any such security.

### 7.23.   Merger, Consolidation or Transfer of Assets.

Except as expressly provided otherwise in this Agreement, Borrower agrees not to dissolve, merge with or into or consolidate with any other Person, or to sell, transfer or convey all or substantially all of its interest in the Facilities or the Facilities Enterprise to another Person, except for a sale, transfer or conveyance to a Person under the following circumstances:

(a)    the Borrower transfers to such Person all the Borrower's authority with respect to the operation of the Facilities and the conduct of the Facilities Enterprise,

(b)    such Person expressly assumes the obligations of the Borrower under all Loan Documents and under all Obligations by a written instrument reasonably satisfactory to the Lender, executed and delivered to each such Person,

(c)    such Person consents to be sued to the same extent and in the same jurisdictions and to be subject to the same remedies as to which the Borrower is subject under each Loan Document,

(d)    such Person delivers to the Lender a legal opinion of counsel reasonably acceptable to the Lender stating that this Agreement and each Loan Document is a valid, binding and enforceable obligation of such Person, and that the conditions of this Section have been satisfied,

(e)    such sale, transfer or conveyance does not cause any Default or Event of Default or any other default, however designated, under or with respect to any Obligation,

(f)    such sale, transfer or conveyance does not cause any Lien on all or any portion of the Facilities (other than Permitted Encumbrances) or any Lien on all or any portion of any Collateral to arise prior to the liens securing any Obligations, and

(g)     the Borrower has received the prior written consent of the Lender, which consent the Lender may withhold in its absolute discretion.

## 7.24.   Loans or Advances.

Not make any further loan to the Borrower's members or managers or any member of any such member's or manager's family or to any Affiliate of the Borrower.

## 7.25.   Guaranties.

Not assume, guarantee, endorse or otherwise become liable upon the obligation of any person, firm or corporation except pursuant to the Loan Documents or by endorsement of negotiable instruments for deposit or collection in the ordinary course of business.

## 7.26.   Maintenance of Properties, Etc.

Upon receipt of all applicable permits, Governmental Authority approvals, and insurance proceeds, maintain, repair and preserve the Facilities, the Equipment, and all of the Borrower's properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear, casualty and condemnation excepted, and from time to time make or cause to be made all necessary and proper replacements, repairs, renewals and improvements so that the efficiency and value of its properties and the Facilities will not be materially impaired.

## 7.27.   Location of Borrower's Facilities on Land.

All parts of the Facilities shall always be located on the Land, except for such removal of personal property or equipment as shall be required for repair or replacement, or, in the case of any vehicles permanently stored or housed on the Land, used in accordance with their intended purposes; and except as otherwise agreed to by the Lender.

## 7.28.   Additional Indebtedness.

Not to incur, nor permit the incurrence by Borrower of, any Debt other than as evidenced by this Agreement and the Note, or current liabilities due within one year from the date of incurrence (other than for borrowed money, amounts due under installment sale, financing lease or similar agreements, rents payable under lease agreements, or any guaranty of the foregoing), or any Debt incurred in the ordinary course of business or the operations of the Borrower, and except Debt incurred with the written consent of the Lender, which such consent shall not be unreasonably withheld or delayed.

Notwithstanding anything in this Agreement to the contrary, until the Loan is paid in full, together with all interest accrued and to accrue thereon, no Debt shall be incurred without the written consent of the Lender if an Event of Default has occurred and is continuing.

## 7.29.   Liens.

121666926v5 0979692

Not incur, or permit the incurrence of, any Liens (including, any mechanics', laborers' and materialmens' liens), other than Permitted Encumbrances, and other than as otherwise expressly may be permitted hereunder or in any other Loan Document.

### 7.30. Maintain Single Purpose Entity Status.

The Borrower shall not:

    (a)    engage in any business or activity other than the ownership, operation and maintenance of the Premises, and activities incidental thereto;

    (b)    acquire or own any material assets other than (i) the Premises, and (ii) such incidental machinery, equipment, fixtures and other personal property as may be necessary for the operation of the Premises;

    (c)    merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets (except as permitted in the Loan Documents) or change its legal structure, without in each case Lender's consent;

    (d)    without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its Articles of Organization, Operating Agreement, Bylaws, or any similar organizational document, as same may be further amended or supplemented, if such amendment, modification, termination or failure to comply would materially and adversely affect its status as a Single Purpose Entity or its ability to perform its obligations hereunder, under the Note or any other document evidencing or securing the Loan;

    (e)    own any subsidiary or make any investment in, any Person without the consent of Lender;

    (f)    commingle its funds or assets with assets of, or pledge its assets with or for, any of its members, Affiliates, principals or any other Person;

    (g)    except as provided for in [Section 6.28] hereof, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Loan and trade payables incurred in the ordinary course of business, payable within ninety (90) days of the date incurred, based on historical amounts;

    (h)    fail to maintain its records, books of account and bank accounts separate and apart from those of its members, principals and Affiliates, and the Affiliates of any of its members, principals, and any other Person;

    (i)    enter into any contract or agreement with any of its members, principals or Affiliates, or the Affiliates of any of its members, principals, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties;

35

(j)      seek its dissolution or winding up in whole, or in part;

(k)      maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any of its members, principals and Affiliates, or the Affiliate of any of its members, principals or any other Person;

(l)      hold itself out to be responsible for the debts of another Person or pay another Person's liabilities out of its own funds;

(m)      make any further loans or advances to any third party, including any of its members, principals or Affiliates, or the Affiliates of any of its members, principals;

(n)      fail to have prepared and filed its own tax returns;

(o)      agree to, enter into or consummate any transaction which would render it unable to confirm the (i) it is not an "employee benefit plan" as defined in Section 3(32) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) less than twenty-five percent (25%) of each of its outstanding class of equity interests are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

(p)      fail either to hold itself out to the public as a legal Person separate and distinct from any other Person or to conduct its business solely in its own name, in order not (i) to intentionally mislead others as to the identity with which such other party is transacting business, or (ii) to overtly suggest that it is responsible for the debts of any third party (including any of its members, principals or Affiliates, or any general partner, principal or Affiliate thereof).

### 7.31.  Change of Use.

Borrower shall not alter or change the use of the Facilities or enter into any operating lease for the Facilities unless Borrower notifies Lender and provides Lender a copy of the proposed lease, obtains Lender's written consent thereto, which consent may be withheld in Lender's reasonable discretion, and obtains and provides Lender with a subordination agreement in a form satisfactory to Lender, as determined by Lender in its reasonable discretion, from such lessee subordinating to all rights of Lender.

### 7.32.  Transfer of Ownership Interests.

Except with respect to a Permitted Transfer or as otherwise allowable under the Deed of Trust, not permit a change in the ownership interest of the Persons owning the Borrower, unless the written consent of the Lender is first obtained, which consent may be granted or refused in Lender's absolute discretion.

### 7.33.  Dividends and Distributions.

36

Borrower shall maintain a Debt Service Coverage Ratio of at least a 1.25:1.00 prior to and a Debt Service Coverage Ratio of at least 1.00:1:00 after dividends and distributions. The ratio shall be measured annually upon receipt of a Certified Public Accountant's prepared audited financial statements and shall be defined as the EBITDA/annual principal and interest payments required to amortize the Loan (EBITDA less dividends and distributions in the case of post coverage).

### 7.34.   Continuing Operations.

Within thirty (30) days following the written request of Lender (which shall not occur more than once per 12 month period), Borrower shall produce a marketing plan addressed and delivered to Lender that sets forth, among other things, Borrower's plans, goals, and strategies for operating and generating revenue from the Facilities.

### 7.35.   Subordination of Management Fees.

At any time and at all times during which Borrower's Debt Service Coverage Ratio is less than 1.00:1.00, calculated on an annual basis, Borrower shall cause Manager to subordinate its management and consulting fees and any other debt, or obligation owing from Borrower to Manager to the extent necessary to make the Debt Service Coverage Ratio at least 1.00:1.00.

## SECTION 8.   EVENTS OF DEFAULT

It shall be an "**Event of Default**" upon the occurrence of any of the following events (hereinafter called Events of Default):

(a)     any material representation or warranty made herein or in any of the Loan Documents or any written report, certificate, financial statement, or other instrument heretofore or at any time hereafter furnished by or on behalf of the Borrower or Guarantors to the Lender shall prove to have been false or misleading in any material respect when made, which is not thereafter cured within ten (10) Business Days' after receipt of written notice thereof from Lender;

(b)     default in the payment of the principal of, interest on or servicing fee with respect to the Note or any Obligations which is not cured within five (5) Business Days' after receipt of written notice thereof from Lender;

(c)     any payments with respect to an Obligation become accelerated because of a default or other nonperformance with respect thereto which is not cured within five (5) Business Days' after receipt of written notice thereof from Lender;

(d)     Borrower shall fail to duly and punctually perform or observe any of the covenants or agreements contained herein (and not otherwise expressly addressed in this Section) or in any of the other Loan Documents which is not performed, observed or otherwise satisfied within a reasonable period of time after receipt of written notice thereof from Lender, which period of time shall not exceed thirty (30) days unless, due to the nature of the obligation required to be performed by Borrower it cannot, within the reasonable means of Borrower (which includes events of Force Majeure), be performed

37

in such 30-day period, in which case no default shall occur as long as Borrower promptly commences and thereafter diligently continues to pursue the satisfaction of such obligation;

(e)    the occurrence of a non-permitted Transfer;

(f)    the Borrower shall make an assignment for the benefit of its creditors, or shall admit in writing its inability to pay its debts as they become due, or shall file a petition under any chapter of the Federal Bankruptcy Code or any similar law, state or federal, now or hereafter existing, or shall become "insolvent" as that term is generally defined under the Federal Bankruptcy Code, or shall in any involuntary bankruptcy case commenced against it/him/her file an answer admitting insolvency or inability to pay its debts as they become due, or shall fail to obtain a dismissal of such case within ninety (90) days (or longer as permitted by the Federal Bankruptcy Code) after its commencement or convert the case from one chapter of the Federal Bankruptcy Code to another chapter, or be the subject of an order for relief in such bankruptcy case, or be adjudged a bankrupt or insolvent, or shall have a custodian, trustee or receiver appointed for, or have any court take jurisdiction of its property, or any part thereof, in any proceeding for the purpose of reorganization, arrangement, dissolution or liquidation, and such custodian, trustee or receiver shall not be discharged, or such jurisdiction shall not be relinquished, vacated or stayed within (90) days (or longer as permitted by the Federal Bankruptcy Code) of the appointment;

(g)    any Guarantor shall fail to keep or perform any covenant, undertaking or agreement on its part under its Guaranty or any separate guaranty, indemnity or other surety arrangement given in connection with the Note which, in any event, is not thereafter performed, satisfied or otherwise cured within ten (10) Business Days' after receipt of written notice thereof from Lender;

(h)    the Borrower or any Guarantor shall be dissolved, liquidated or wound up or shall fail to maintain its respective existence as a going concern in good standing, provided, however, the death or incapacity of Woolley shall not, in and of itself, be deemed to cause an event of default;

(i)    a garnishment summons or writ of attachment is issued against or served upon the Lender for the attachment of any property of the Borrower in the Lender's possession or any indebtedness owing to the Borrower, unless appropriate papers are filed by the Borrower contesting the same within ninety (90) days after the date the Lender provides Borrower with written notice of such service or such shorter period of time as may be reasonable in the circumstances; or a levy is made under any process on the Premises and such levy shall not be promptly insured or bonded over and shall continue unstayed for seventy-five (75) days or more after the date the Lender provides Borrower with written notice thereof;

(j)    any final judgment shall be entered against the Borrower that substantially impairs the ability of the Borrower to perform each and every one of its material obligations under the Loan Documents;

121666926v5 0979692

(k) any lien for labor, material, taxes or otherwise is filed against the Premises and such lien shall not be released, insured or bonded over to the Lender's reasonable satisfaction within sixty (60) days after receipt of written notice thereof from Lender;

(l) any final judgment, writ or warrant of attachment or other similar final process is docketed, entered or filed against the Premises, and such final judgment, writ of execution or similar final process is (a) not insured, (b) is in an amount in excess of $50,000.00, and (c) is not satisfied, released, vacated, set aside or stayed within sixty (60) days after Borrower's receipt of such final judgment, writ or warrant of attachment or other similar final process;

(m) the Borrower shall fail to provide the Lender with financial information required to be provided hereunder which is not cured within ten (10) Business Days' after receipt of written notice thereof from Lender;

(n) the Borrower shall violate any term or provision of any Regulations relating to the Facilities, which violation which is not cured within thirty (30) days after receipt of written notice thereof from Lender and which materially impairs the continued operations of the Facilities in substantially the manner in which the Facilities were operated prior to such violation, or the Borrower, for any reason, ceases business activities at the Facilities other than due to acts or omissions of Lender or any of Lender's Representatives, casualty, condemnation, or other events of Force Majeure; or

(o) a Material Adverse Effect shall occur with respect to Borrower, any Guarantor, or the Collateral which is not cured within thirty (30) days after receipt of written notice thereof from Lender other than due to acts or omissions of Lender or any of Lender's Representatives, casualty, condemnation, or other events of Force Majeure;

then the Lender, upon such occurrence or at any time thereafter until such Event of Default is performed, satisfied or otherwise cured, may exercise one or more of the following rights and remedies:

(p) declare all of the principal of, interest on or servicing fees accrued with respect to the Loan to be immediately due and payable, and the same shall thereupon be immediately due and payable, without presentment or other notice or demand;

(q) without notice or demand, offset any indebtedness Lender or any participant, or Lender's or any participant's successors or assigns then owe to the Borrower, whether or not then due, against any obligation then owed to Lender or any participant's successors or assigns by the Borrower, whether or not then due;

(r) exercise or enforce any and all other rights or remedies available by law or agreement against the Borrower, or against any other person or property; and

(s) exercise or enforce any and all other rights or remedies available under any of the Loan Documents.

Notwithstanding the foregoing or any other term or provision in any Loan Document to the contrary, under no circumstances shall Borrower or any Guarantor be responsible for, or liable to Lender or any of Lender's Representatives for, any special, punitive, or consequential damages, all of which are hereby expressly waived by Lender, for itself and on behalf of Lender's Representatives.

Even though the Note and the Obligations of the Borrower under the Loan Agreement are secured by the Deed of Trust prior to demanding payment and seeking remedies hereunder, the Lender need not undertake or commence the enforcement of any remedies available under such agreement, and upon any Event of Default of Borrower under the Loan Agreement, the Note, or any Loan Document, the Lender may proceed directly to enforce hereunder the payment of any amounts owing by Borrower under the Loan Agreement or the Note. Any Event of Default under any one Loan Document shall be an Event of Default, as applicable, under all the Loan Documents.

## SECTION 9.    MISCELLANEOUS

### 9.01.   No Waiver; Remedies Cumulative.

No failure on the part of the Lender to exercise and no delay in exercising any right, power or privilege under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege. Under any Loan Document, the consent or approval by Lender to or of any act by Borrower requiring further consent or approval shall not be deemed to waive or render unnecessary the consent or approval to or of any subsequent act. The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law or in equity or by statute.

### 9.02.   Notices.

All notices, requests, demands and other communications required to or permitted to be given under this Agreement shall be in writing and shall be conclusively deemed to have been duly given: (a) when hand delivered; (b) five days after the same have been deposited in the United States post office via certified mail/return receipt requested; (c) the day sent by facsimile transmission (if sent prior to 5:00 P.M. local time where the Premises are located, and if receipt has been acknowledged by the operator of the receiving machine or automatically by such machine); or (d) the next Business Day after same have been deposited with a national overnight delivery service (e.g., Federal Express) – in each case addressed to the parties at the address set forth below. A party may change or supplement the addresses given herein, or designate additional addresses, for purposes of this Section by giving all of the other parties hereto written notice of the new address in the manner set forth above.

121666926v5 0979692

Notices to the Lender shall be addressed to:

> First National Bank
> Attn: Todd Christoffer
> 632 Main Street
> Rapid City, South Dakota 57701
> Telephone: (605) 399-0990
> Facsimile: (605) 399-0995

With copy to:

> Hinshaw & Culbertson LLP
> 333 South Seventh Street
> Suite 2000
> Minneapolis, MN 55402
> Attn.: David Mylrea, Esq.
> Telephone: (612) 333-3434
> Facsimile: (612) 334-8888

Notices to the Borrower shall be addressed to:

> Woolley's Classic Suites-Denver, LLC
> 6600 LBJ Freeway, Suite 195
> Dallas, Texas 75240
> Attn.: Chrissie Piekenbrock

With copy to:

> Scheef & Stone L.L.P.
> 2600 Network Blvd., Suite 400
> Frisco, Texas 75034
> Attn: John Bloomer, Esq.

Notices to the Guarantors shall be addressed to:

> Robert Edward Woolley Family Trust and
> Robert E. Woolley
> 6600 LBJ Freeway, Suite 195
> Dallas, Texas 75240

**9.03. Fees/Taxes/Attorneys' Fees.**

The Borrower shall reimburse the Lender, upon demand, for all reasonable costs and expenses actually incurred, including without limitation reasonable attorneys' fees paid or incurred by the Lender in connection with:

(a)     the review, negotiation or preparation of the Loan Documents and any amendments or modifications to any of the Loan Documents requested by Borrower or, if

41

an Event of Default has occurred and is continuing, requested by the Lender, and any other services deemed reasonably necessary by the Lender in connection therewith; and

(b)     the enforcement by the Lender during the term hereof or thereafter of the rights or remedies of the Lender hereunder or under any Loan Documents, instruments or agreements related thereto, including without limitation, reasonable costs and expenses of collection upon Default or an Event of Default, whether or not suit is filed with respect thereto and whether such costs are paid or incurred, or to be paid or incurred, prior to or after entry of judgment.

(c)     all other aspects of the Loan, including but not limited to, fees and expenses charged by consultants for services and materials comprising Lender's due diligence in determining whether to make the Loan, reasonable attorneys' fees related to due diligence related and preparing the Loan Documents, and expenses of title or other insurance companies for premiums and fees and expenses incurred for protection of the Collateral prior to a Triggering Event unless caused by Borrower.

Borrower agrees to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter reasonably determined by the Lender to be payable in connection with the Loan Documents, or any other documents, instruments or transactions pursuant to or in connection herewith or therewith, regardless on whom such may be imposed under any applicable laws, and Borrower agrees to hold the Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions, unless such omission or delay is due to negligence or willful misconduct on the part of the Lender or any of Lender's Representatives. All such expenses, taxes or attorneys' fees shall be payable to the Lender, as applicable, on demand. The obligations of the Borrower under this Section shall survive the repayment of the Note and the Loan.

Notwithstanding anything herein to the contrary, in the event of a dispute between the parties, the prevailing party in any lawsuit, arbitration or administrative proceeding shall be entitled to an award of reasonable costs and expenses actually incurred, including without limitation, reasonable attorneys' fees.

121666926v5 0979692

### 9.04.  Indemnification.

The Borrower agrees to indemnify and hold harmless the Lender and Lender's Representatives against any and all actual losses, claims, damages or liability to which the Lender's Representatives may become subject under any law in connection with the carrying out of the transactions contemplated by this Agreement or any other Loan Document, or the conduct of any activity on the Premises or any accident, injury, death or damage to any person or property occurring in, on or about the Premises or any street, drive, sidewalk, curb or passageway adjacent thereto which, in all events, occurs prior to a Triggering Event (other than as a result of the act of commission or omission, including breach of the Loan Documents, negligence or willful misconduct, of any such party), and to reimburse the Lender's Representatives for any reasonable out-of-pocket legal and other expenses (including reasonable attorneys' fees, whether incurred at trial, on appeal, in bankruptcy proceedings, or otherwise) incurred by the Lender's Representatives, in connection with investigating any such losses, claims, damages or liabilities or in connection with defending any actions relating thereto which, in all events, occurs prior to a Triggering Event (other than as a result of the act of commission or omission, including breach of the Loan Documents, negligence or willful misconduct, of any such party).  The Lender agrees, at the request and, if applicable, reasonable expense of the Borrower, to cooperate in the making of any investigation in defense of any such claim and promptly to assert any or all of the rights and privileges and defenses that may available to the Lender.  The Borrower further agrees to hold harmless the Lender's Representatives from and against all actual losses, damages, penalties, liabilities, or expenses (including reasonable attorneys' fees, whether incurred at trial, on appeal, in bankruptcy proceedings, or otherwise) due to or arising out of any intentional misrepresentation of information furnished to the Lender by the Borrower or as a result of an Event of Default by Borrower.  The provisions of this Section shall survive the payment of the Note and the Loan.

(a)  Without limiting the generality of the foregoing, but subject to the conditions and limitations set forth therein or otherwise under the terms of this Agreement, the Borrower shall bear all actual loss, expense (including reasonable attorneys' fees, whether incurred at trial, on appeal, in bankruptcy proceedings, or otherwise), and damage in connection with, and agrees to indemnify and hold harmless the Lender and the Lender's Representatives from all claims, demands and judgments made or recovered against the Lender or the Lender's Representatives because of bodily injuries, including death at any time prior to a Triggering Event resulting from any of the foregoing, and because of damages to property of the Lender's Representatives (including loss of use) from any cause whatsoever other than as a result of, or arising out of, the acts or omissions of any such party (including without limitation any breach of the terms of the Loan Documents), arising out of, or in connection with the acquisition, construction and installation of the Equipment or the construction, reconstruction or alteration of the Facilities, if due to any act of omission or commission, including negligence, of the Borrower or any lessee of the Facilities or any part thereof, or any of their respective agents, contractors, subcontractors, servants, directors, officers, employees, licensees or invitees.  The Borrower's liability hereunder shall not be limited to the extent of such insurance or subject to any exclusions from coverage in any insurance policy.

43

The obligations of the Borrower under this Section shall survive the repayment of the Note and the Loan.

(b)     The Borrower hereby agrees to defend, indemnify and hold harmless the Lender and the Lender's Representatives (the "**Indemnified Parties**") from and against any and all actual claims, losses, damages, liabilities, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense and settlement of claims or remediation of contamination, whether incurred at trial, on appeal, in bankruptcy proceedings, or otherwise) incurred by the Indemnified Parties as a result of or in connection with the presence or removal of Hazardous Substances or as a result of or in connection with activities regulated under [Section 6.07] which, in any and all events, occurs prior to a Triggering Event, but not otherwise. The Borrower shall bear, pay and discharge, as and when the same become due and payable, any and all such judgments or claims for damages, penalties or otherwise, against the Indemnified Parties, shall hold the Indemnified Parties harmless against all claims, losses, damages, liabilities, costs and expenses, administrative proceedings, and negotiations of any description with any and all persons, political subdivisions or government agencies arising out of any of the occurrences set forth in [Section 6.07] which, in any and all events, occurs prior to a Triggering Event, but not otherwise. These covenants, representations, warranties and indemnities shall be deemed continuing covenants, representations, warranties and indemnities running with the Premises for the benefit of the Lender. The amount of all such indemnified loss, damage, expense or cost, shall be interest thereon at the rate of interest in effect on the Note and shall become additional indebtedness secured hereby and shall become immediately due and payable in full on demand by the Lender, its successors and assigns, unless any such loss or claim is subject to challenge or defense from Borrower, in which event such amounts shall become due and payable in full only after such claim(s) have been finally adjudicated by a court of competent jurisdiction. Proceeds of insurance obtained by the Borrower, to the extent paid to the Lender in which Lender is entitled to retain hereunder, shall be applied towards the satisfaction of the Borrower's obligations under this Paragraph.

The provision of this Section shall survive the payment of the Note and the Loan.

**9.05.   Performance on Business Day.**

If performance under the Loan Documents is due on a non-Business Day, the required date of performance shall be the closest Business Day succeeding the non-Business Day on which the performance is otherwise due.

**9.06.   Amendments, Waivers, and Administrative Modifications.**

No amendment, modification or waiver of any provision of the Loan Documents and no consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by or on behalf of the Lender, and then such amendment, modification, waiver or consent shall be effective only in the specific instance and for the

purpose for which given. Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

Notwithstanding the foregoing, Borrower, any Guarantor, and any other Person that is party to a document comprising the Loan Documents, hereby authorizes Lender and its agents, including but not limited to, Lender's counsel, to make administrative modifications to the Loan Documents, including but not limited to, completing blanks in the Loan Documents with dates and titles of officers, though the foregoing shall not be construed as authorization for Lender to sign any Loan Document on behalf of a Person and such Persons retain the right to challenge the accuracy of the modifications made by Lender or its agents.

### 9.07. Successors and Assigns Included in Parties.

Whenever in this Agreement one of the parties hereto is named or referred to, the heirs, legal representatives, successors and assigns of such parties shall be included and all covenants and agreements contained in this Agreement by or on behalf of the Borrower or by or on behalf of the Lender shall bind and inure to the benefit of their respective heirs, legal representatives, successors and assigns, whether so expressed.

### 9.08. Binding Effect and Assignment/Third Party Beneficiary.

This Agreement shall be binding upon and inure to the benefit of the Borrower, the Lender and their respective successors and permitted assigns, except that the Borrower may not transfer or assign its rights hereunder without the prior written consent of the Lender.

### 9.09. Marshalling; Payments Set Aside.

The Lender shall be under no obligation to marshal any assets in favor of the Borrower or any other Person or against or in payment of the Loan and other Indebtedness of the Borrower to the Lender. To the extent that the Borrower makes a payment or payments to the Lender or the Lender exercises its rights of setoff, and such payment or payments or the proceeds of such setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

### 9.10. Section Titles.

The Section titles contained in this Agreement shall be without substantive meaning or content of any kind whatsoever and shall not govern the interpretation of any of the provisions of this Agreement.

### 9.11. Reliance by the Lender.

45

All covenants, agreements, representations and warranties made herein and in any Loan Document by the Borrower shall, notwithstanding any investigation by the Lender, be deemed to be material to and to have been relied upon by the Lender, and shall survive the execution and delivery of this Agreement, and shall inure to the benefit of the Lender, its successors and assigns.

### 9.12.   Multiple Counterparts.

This Agreement may be fully executed in any number of counterparts, each of which shall be deemed an original and the same agreement.

### 9.13.   Invalid Provisions to Affect No Others.

If fulfillment of any provision of this Agreement or any of the other Loan Documents or of any transaction related to this Agreement or the other Loan Documents shall, at the time performance of such provision is due, involve transcending the limit of validity prescribed by applicable law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity prescribed by applicable law, and such clause or provision shall be deemed invalid as though not contained in this Agreement, and the remainder of this Agreement shall remain operative in full force and effect, it being the intent of the parties that the provisions are severable. Except as otherwise expressly provided, nothing in this Agreement or the other Loan Documents shall alter or affect any provision, condition or covenant contained in this Agreement or any other Loan Documents, or affect or impair any rights, powers, or remedies hereunder or thereunder, it being the intent of the parties hereto that the provisions of the Loan Documents are severable and shall continue in full force and effect except as expressly stated otherwise.

### 9.14.   Number and Gender.

Whenever the singular or plural number, masculine or feminine or neuter gender is used herein, it shall equally include the other.

### 9.15.   Time of Essence.

Time is of the essence in the performance of this Agreement.

### 9.16.   No Joint Venture.

The Lender is not, and shall not by reason of any provision of any of the Loan Documents be deemed to be, a joint venturer with or partner or agent of the Borrower.

### 9.17.   Estoppel Certificate.

At any time and from time to time but not more often than once in any twelve month period, within fifteen (15) Business Days after receipt from the Lender of a written request therefor, the Borrower shall prepare, execute, and deliver to the Lender and any other party that the Lender may designate an estoppel certificate stating: (a) the amount of the unpaid principal balance and accrued interest due under the Note and secured by the Deed of Trust on the date thereof; (b) the date upon which the last payment secured by the Deed of Trust was made and

the date the next payment secured by the Deed of Trust is due; and (c) that the provisions of the Deed of Trust have not been amended or changed in any manner, that there are no defaults or events of default then existing under the terms of the Deed of Trust, and that to Borrower's knowledge, the Borrower has no defenses, claims or offsets against full enforcement hereof according to the terms hereof, or listing and describing any such amendments, changes, defaults, events of default, defenses, claims or offsets that do exist.

### 9.18.  Notice of Change in Location.

The Borrower shall promptly notify the Lender of any change in location of the Borrower's principal places of business or the offices where it keeps its records concerning accounts and contract rights.

### 9.19.  Renewal or Extension.

All provisions of this Agreement relating to the Note and the related Loan Documents shall apply with equal force and effect to each and all related documents hereinafter executed which, in whole or in part represent a renewal, extension for any period, increase or rearrangement of any part of the Note or such related documents.

### 9.20.  Setoff.

If the unpaid principal amount of the Loan, interest accrued thereon, or any other amount owing by the Borrower under the Loan Documents shall have become due and payable (by demand, acceleration or otherwise), upon the occurrence and during the continuance of an Event of Default the Lender shall have the right, in addition to all other rights and remedies available to them, upon not less than five Business Days prior written notice to the Borrower, to set off against, and to appropriate and apply to such due and payable amounts any debt owing to, and any other funds held in any manner by Lender for the account of the Borrower. Such right shall exist whether or not the Lender shall have made any demand hereunder or under any other Loan Document, whether or not such debt owing to or funds held for the account of the Borrower is or are matured or unmatured, and regardless of the existence or adequacy of any Collateral, guaranty or any other security, right or remedy available to the Lender.

### 9.21.  Name and Logo.

The Borrower hereby consents to the Lender's use of the Borrower's name and logo in the Loan offering book and Loan closing transcript without any consideration to the Borrower other than the Loan. During the term of the Loan, and prior to any Triggering Event, the Lender may also use the Borrower's name and logo in any tombstone ads or other promotional materials without any consideration to the Borrower other than the Loan, provided that the Lender first obtains the consent of the Borrower.

### 9.22.  Remedies Cumulative.

The rights and remedies herein specified of the parties hereto are cumulative and not exclusive of any rights or remedies the parties hereto would otherwise have at law or in equity or by statute, but are otherwise subject to the waivers and limitations set forth herein.

121666926v5 0979692

### 9.23.   Integration; Conflicting Terms.

This Agreement, together with the other Loan Documents, comprises the entire agreement of the parties on the subject matter hereof and supersedes and replaces all prior agreements, oral and written, on such subject matter. If any term of any of the other Loan Documents expressly conflicts with the provisions of this Agreement, the provisions of this Agreement shall control; provided, however, that the inclusion of supplemental rights and remedies of the Lender in any of the other Loan Documents shall not be deemed a conflict with this Agreement.

### 9.24.   Governing Law and Construction.

The Loan Documents shall be governed by, and be construed in accordance with, the internal law of the State of Colorado and applicable federal laws. Whenever possible, each provision of the Loan Documents and any other statement, instrument or transaction contemplated hereby or thereby or relating hereto or thereto shall be interpreted in such manner as to be effective and valid under such applicable law, but, if any provision of the Loan Documents or any other statement, instrument or transaction contemplated hereby or thereby or relating hereto or thereto shall be held to be prohibited or invalid under such applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Loan Documents or any other statement, instrument or transaction contemplated hereby or thereby or relating hereto or thereto. The parties shall endeavor in good-faith negotiations to replace any invalid or unenforceable provisions with a valid provision the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provision.

### 9.25.   Consent to Jurisdiction; Punitive Damages.

(a)      **Consent to Jurisdiction**.   The Borrower expressly submits to and consents to be sued in the United States District Court - District of Colorado and all federal courts to which decisions of the United States District Court - District of Colorado may be appealed, or, if the claim asserted under this Agreement or any Loan Document does not involve a federal question over which the United States District Court - District of Colorado has jurisdiction, or in Lender's discretion, then to be sued in the courts of the State of Colorado, in Adams County, and if none of the foregoing courts shall have jurisdiction, then any other court having jurisdiction over the matter and parties. The parties hereby explicitly consent to the jurisdiction of each of the foregoing state and federal court systems for proceedings brought pursuant to this Section.

(b)      **Prohibition on Punitive Damages**.   The parties hereto acknowledge and agree that each has equal bargaining power and that each has freely entered into this Agreement after such consultation with their attorneys as they deem advisable, and that therefore, the parties hereby agree that notwithstanding any other provision herein, no court of competent jurisdiction shall have power to award punitive damages and any such award shall be null and void and of no effect.

### 9.26.   Jury Trial.

48

BORROWER HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION RELATING TO THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS OR AT LAW OR IN EQUITY.

### 9.27. Legal Counsel.

Borrower hereby warrants and represents to Lender that it has consulted with and received advice from legal counsel of its choice with respect to this Agreement and the other Loan Documents and all waivers of rights therein, or it has had an opportunity to consult with legal counsel of its choice and has made the decision not to consult with legal counsel. Without limiting the forgoing, Borrower acknowledges that it has legal and business options available to it other than the execution and delivery of this Agreement and any other document related thereto but has nonetheless decided to execute this Agreement and such other documents and has done so voluntarily, knowingly, intelligently, and without duress. The parties hereby agree that the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

### 9.28. Term.

This Loan Agreement shall be in effect until the Maturity Date or until such later time as all outstanding obligations under the Note, this Loan Agreement, and the other Loan Documents have been discharged in full ("**Term**").

### 9.29. Actions by Lender.

Any action permitted or required to be taken in connection with this Agreement or any other Loan Document by the Lender may be taken solely by the Lender; Borrower acknowledges and agrees that the Lender will not be required to act without first obtaining the necessary approval of any loan participants participating in the Loan. This provision is expressly declared to include actions for enforcement of any remedies available to the Lender hereunder or under any Loan Document and the action related to declaring an Event of Default or accelerating the payment of amounts due under the Note. The Lender is hereby expressly authorized to disclose any and all information heretofore or hereafter received that the Lender received in connection with the Loan.

[SIGNATURE PAGES FOLLOW]

121666926v5 0979692

## BORROWER'S SIGNATURE PAGE TO LOAN AGREEMENT

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**Woolley's Classic Suites-Denver, LLC,**
a Texas limited liability company

By:     Woolley's Classic Suites, LLC,
        a Texas limited liability company,
        its Manager

        By:     Woolley Hotel Company,
                a Texas corporation,
                its Manager

                By: _____
                    Robert E. Woolley, President

## LENDER'S SIGNATURE PAGE TO LOAN AGREEMENT

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**First National Bank,** a national bank

By: _____

**Print Name:** _____

**Its:** _____

## EXHIBIT A
## LEGAL DESCRIPTION OF LAND

LOT 1, BLOCK 1, GATEWAY PARK IV SUBDIVISION FILING NO. 12, COUNTY OF ADAMS, STATE OF COLORADO.

121666926v5 0979692

EXHIBIT B

## Old Republic National Title Insurance Company
### Schedule B-2

### (Exceptions)

Order Number: ABD70473081-4

The policy or policies to be issued will contain exceptions to the following unless the same are disposed of to the satisfaction of the Company:

1. Any facts, rights, interests, or claims thereof, not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

2. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

3. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

4. Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

5. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date of the proposed insured acquires of record for value the estate or interest or mortgage thereon covered by this Commitment.

6. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

7. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water.

8. EXISTING LEASES AND TENANCIES, IF ANY.

9. RIGHT OF THE PROPRIETOR OF A VEIN OR LODE TO EXTRACT AND REMOVE HIS ORE THEREFROM, SHOULD THE SAME BE FOUND TO PENETRATE OR INTERSECT THE PREMISES HEREBY GRANTED, AND A RIGHT OF WAY FOR DITCHES OR CANALS CONSTRUCTED BY THE AUTHORITY OF THE UNITED STATES, AS RESERVED IN UNITED STATES PATENT RECORDED MARCH 12, 1892 IN BOOK A24 AT PAGE 172.

10. TERMS, CONDITIONS, PROVISIONS, BURDENS, OBLIGATIONS AND EASEMENTS AS SET FORTH IN AGREEMENTS BETWEEN THE CITY OF AURORA AND UNION PACIFIC LAND RESOURCES CORPORATION RECORDED JUNE 12, 1973 IN BOOK 1869 AT PAGE 168, OCTOBER 9, 1974 IN BOOK 1957 AT PAGE 895, SEPTEMBER 10, 1981 IN BOOK 2585 AT PAGES 413 AND 419 AND OCTOBER 24, 1991 IN BOOK 3828 AT PAGE 863.

11. OIL AND GAS LEASE BETWEEN CHAMPLIN PETROLEUM COMPANY AND AMOCO PRODUCTION COMPANY, RECORDED JULY 26, 1977 IN BOOK 2160 AT PAGE 805 AND ANY AND ALL ASSIGNMENTS THEREOF, OR INTEREST THEREIN.

AFFIDAVIT OF PRODUCTION RECORDED SEPTEMBER 2, 1983 IN BOOK 2786 AT PAGE 382.

NOTE: THE PRESENT OWNERSHIP OF THE LEASEHOLD CREATED BY SAID LEASE AND OTHER MATTERS AFFECTING THE INTEREST OF THE LESSEE ARE NOT SHOWN HEREIN.

12. TERMS, RESERVATIONS, ACCESS RIGHTS, CONDITIONS, PROVISIONS, BURDENS, OBLIGATIONS

## Old Republic National Title Insurance Company
### Schedule B-2

### (Exceptions)

Order Number: ABD70473081-4

The policy or policies to be issued will contain exceptions to the following unless the same are disposed of to the satisfaction of the Company:

AND EASEMENTS AS SET FORTH IN SPECIAL WARRANTY DEED RECORDED DECEMBER 20, 1988 IN BOOK 3520 AT PAGE 318.

13.  TERMS, CONDITIONS, PROVISIONS, BURDENS, OBLIGATIONS AND EASEMENTS AS SET FORTH IN ORDER FOR IMMEDIATE POSSESSION RECORDED APRIL 28, 1992 IN BOOK 3896 AT PAGE 549.

14.  TERMS, CONDITIONS, PROVISIONS, BURDENS AND OBLIGATIONS AS SET FORTH IN NON-DRILLING AGREEMENT RECORDED JULY 19, 1995 IN BOOK 4550 AT PAGE 356.

15.  TERMS, RESERVATIONS, CONDITIONS, PROVISIONS, BURDENS, OBLIGATIONS AND EASEMENTS AS SET FORTH IN SPECIAL WARRANTY DEED RECORDED JULY 19, 1995 IN BOOK 4550 AT PAGE 500 AND RELINQUISHMENT AND QUITCLAIM DEED THERETO RECORDED OCTOBER 23, 1995 IN BOOK 4611 AT PAGE 939.

16.  ANY TAX, LIEN, FEE, OR ASSESSMENT BY REASON OF INCLUSION OF SUBJECT PROPERTY IN THE GATEWAY PARK METROPOLITAN DISTRICT, AS EVIDENCED BY INSTRUMENT RECORDED DECEMBER 06, 1995, IN BOOK 4640 AT PAGE 166.

COURT ORDER APPROVING THE NAME CHANGE TO SAND CREEK METROPOLITAN DISTRICT RECORDED MARCH 25, 1996 IN BOOK 4709 AT PAGE 175.

17.  RESTRICTIVE COVENANTS, WHICH DO NOT CONTAIN A FORFEITURE OR REVERTER CLAUSE, BUT OMITTING ANY COVENANTS OR RESTRICTIONS, IF ANY, BASED UPON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, FAMILIAL STATUS, MARITAL STATUS, DISABILITY, HANDICAP, NATIONAL ORIGIN, ANCESTRY, OR SOURCE OF INCOME, AS SET FORTH IN APPLICABLE STATE OR FEDERAL LAWS, EXCEPT TO THE EXTENT THAT SAID COVENANT OR RESTRICTION IS PERMITTED BY APPLICABLE LAW, AS CONTAINED IN INSTRUMENT RECORDED MAY 08, 1996, IN BOOK 4743 AT PAGE 835.

ESTOPPEL AND AGREEMENT RECORDED DECEMBER 16, 1997 IN BOOK 5184 AT PAGE 277.

AMENDMENTS RECORDED MAY 15, 1998 IN BOOK 5334 AT PAGE 314, MARCH 14, 2002 UNDER RECEPTION NO. C0940263, MARCH 27, 2007 UNDER RECEPTION NO. 2007000030764 AND MAY 27, 2014 UNDER RECEPTION NO. 2014000032147.

18.  EASEMENTS, CONDITIONS, COVENANTS, RESTRICTIONS, RESERVATIONS AND NOTES ON THE GATEWAY PARK IV WEST, GENERAL DEVELOPMENT/PRELIMINARY DEVELOPMENT PLAN RECORDED FEBRUARY 25, 1997 UNDER RECEPTION NO. C0256602.

19.  TERMS, CONDITIONS, PROVISIONS, BURDENS, OBLIGATIONS AND EASEMENTS AS SET FORTH AND GRANTED IN EASEMENT AGREEMENT RECORDED JUNE 29, 1998 IN BOOK 5378 AT PAGE 713.

20.  TERMS, CONDITIONS, PROVISIONS, BURDENS AND OBLIGATIONS AS SET FORTH AND GRANTED IN NOTICE RECORDED JANUARY 26, 2004 UNDER RECEPTION NO. C1269163.

21.  TERMS, PROVISIONS, BURDENS, OBLIGATIONS AND EASEMENTS AS SET FORTH AND GRANTED IN RECIPROCAL ACCESS EASEMENT AGREEMENT RECORDED APRIL 10, 2007 UNDER RECEPTION NO. 2007000035849.

22.  TERMS, CONDITIONS, PROVISIONS, BURDENS, OBLIGATIONS AND EASEMENTS AS SET FORTH

## Old Republic National Title Insurance Company
### Schedule B-2

### (Exceptions)

Order Number: ABD70473081-4

The policy or policies to be issued will contain exceptions to the following unless the same are disposed of to the satisfaction of the Company:

AND GRANTED IN PUBLIC ACCESS EASEMENT RECORDED MAY 11, 2007 UNDER RECEPTION NO. 2007000046701.

23. EASEMENT GRANTED TO CITY OF AURORA, FOR SIDEWALK AND UTILITY, AND INCIDENTAL PURPOSES, BY INSTRUMENT RECORDED JUNE 25, 1998, IN BOOK 5376 AT PAGE 612.

24. EASEMENT GRANTED TO PUBLIC SERVICE COMPANY OF COLORADO, FOR UTILITY LINES, AND INCIDENTAL PURPOSES, BY INSTRUMENT RECORDED JUNE 01, 2006, UNDER RECEPTION NO. 20060601000561140.

25. EASEMENTS, CONDITIONS, COVENANTS, RESTRICTIONS, RESERVATIONS AND NOTES ON THE PLAT OF GATEWAY PARK IV SUBDIVISION FILING NO. 12 RECORDED SEPTEMBER 29, 2011 UNDER RECEPTION NO. 2011000063424.

26. RESERVATIONS OF WATER, OIL, GAS AND MINERALS AND THE TERMS, CONDITIONS, PROVISIONS, BURDENS, OBLIGATIONS AND EASEMENTS AS SET FORTH AND GRANTED IN SPECIAL WARRANTY DEED RECORDED SEPTEMBER 29, 2011 UNDER RECEPTION NO. 2011000063425.

27. TERMS, CONDITIONS, PROVISIONS, BURDENS AND OBLIGATIONS OF A "REPURCHASE OPTION", AS SET FORTH IN SPECIAL WARRANTY DEED RECORDED SEPTEMBER 29, 2011 UNDER RECEPTION NO. 2011000063425.

EXTENSION OF CONDITIONS AND AMENDMENT TO DEED RECORDED OCTOBER 26, 2012 UNDER RECEPTION NO. 2012000080714.

28. TERMS, CONDITIONS, PROVISIONS, BURDENS, OBLIGATIONS AND EASEMENTS AS SET FORTH AND GRANTED IN UTILITY EASEMENT RECORDED MARCH 15, 2012 UNDER RECEPTION NO. 2012000019435.

29. TERMS, CONDITIONS, PROVISIONS, BURDENS, OBLIGATIONS AND EASEMENTS AS SET FORTH AND GRANTED IN EASEMENT FOR SIDEWALK PURPOSES RECORDED MARCH 15, 2012 UNDER RECEPTION NO. 2012000019436.

30. TERMS, CONDITIONS, PROVISIONS, BURDENS, OBLIGATIONS AND EASEMENTS AS SET FORTH AND GRANTED IN FIRE LANE EASEMENT RECORDED MARCH 15, 2012 UNDER RECEPTION NO. 2012000019437.

31. TERMS, CONDITIONS, PROVISIONS, BURDENS AND OBLIGATIONS AS SET FORTH IN WOOLLEY'S CLASSIC SUITES SITE PLAN RECORDED MARCH 04, 2013 UNDER RECEPTION NO. 2013000018943.

32. ANY FACTS, RIGHTS, INTERESTS OR CLAIMS WHICH MAY EXIST OR ARISE BY REASON OF THE FOLLOWING FACTS SHOWN ON ALTA/ACSM LAND TITLE SURVEY CERTIFIED _____, 2015, PREPARED BY COLORADO ENGINEERING & SURVEYING INC., JOB #CES 2015-1820 SAID DOCUMENT STORED AS OUR ESI 25646665 AND 25646696.

A. THE ENCROACHMENT OF THE FOUR STORY STUCCO HOTEL ONTO THOSE CERTAIN EASEMENTS RECORDED MARCH 15, 2012 UNDER RECEPTION NO. 2012000019435 AND MARCH 15, 2012 UNDER RECEPTION NO. 2012000019437.

## EXHIBIT C
## SCHEDULE OF LITIGATION, ETC.

None.

121666926v5 0979692

# EXHIBIT B

## FORBEARANCE AND CONSENT AGREEMENT

This Forbearance and Consent Agreement (this "Agreement") is made effective as of the ___ day of July, 2018 (the "Effective Date"), by and among Woolley's Classic Suites-Denver, LLC, a Texas limited liability company ("Borrower"), Robert E. Woolley and the Robert Edward Woolley Family Trust (each a "Guarantor" and collectively the "Guarantors"), and First National Bank, a national bank ("Lender").

### RECITALS

Whereas, Borrower and Lender have entered into that certain Loan Agreement dated December 16, 2015 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), pursuant to which Lender made a loan to Borrower in the original principal amount of $26,500,000 (the "Loan").

Whereas, each Guarantor executed and delivered a Guaranty dated on or about December 16, 2015 (collectively, the "Guaranty"), in favor of Lender, pursuant to which each Guarantor jointly and severally, fully and unconditionally guaranteed to Lender, among other things, the full and prompt payment when due of all principal and interest amounts evidenced by the Note (as defined in the Loan Agreement).

Whereas, the following Events of Default exist under the Loan Agreement (collectively, the "Existing Defaults"):

(a)     Borrower has failed to maintain a Debt Service Coverage Ratio of at least a 1.25:1.00 prior to, and a Debt Service Coverage Ratio of at least 1.00:1.00 after, dividends and distributions as required by Section 7.33 of the Loan Agreement (the "DSCR Default");

(b)     Borrower reports that it incurred $300,000 of indebtedness (the "Subordinated Debt") from Robert E. Woolley ("Subordinated Lender") without Lender's written consent in violation of Section 7.28 of the Loan Agreement (the "Subordinated Debt Default");

(c)     A mechanic's lien has been filed in violation of Section 7.29 of the Loan Agreement because of Borrower's failure to pay certain repair costs totaling approximately $140,000 (the "Lien Default"); and

(d)     Borrower has failed to provide, and failed to cause Guarantors to provide, to Lender certain financial reports required by Section 7.06(c) of the Loan Agreement (the "Reporting Default").

Whereas, Borrower has requested that Lender (i) temporarily forbear from exercising its remedies with respect to the DSCR Default and the Reporting Default and (ii) consent, notwithstanding the Subordinated Debt, to the release of funds from the Replacement Reserve for Borrower's use in curing the Lien Default, and to the payment of certain management fees to Manager.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  <u>Definitions; Recitals</u>.  Capitalized terms used and not defined in this Agreement shall have the meanings given them in the Loan Agreement.  Borrower and Guarantors acknowledge that the above Recitals are true and correct statements of fact.

2.  <u>Existing Defaults</u>.  Borrower and Guarantors acknowledge and agree that (a) the Existing Defaults have occurred and are continuing Events of Default under the Loan Documents; (b) all of the outstanding amounts owed by Borrower to Lender under the Loan Documents, as set forth herein, are due and owing without any defense, right of setoff or counterclaim; and (c) Lender has the immediate right to exercise all rights and remedies provided under the Loan Documents, including without limitation all rights and remedies with respect to all Collateral for the Loan and the right to impose interest at the Default Rate beginning from the first date of any of the Existing Defaults.

3.  <u>Conditional Forbearance</u>.  Subject to the terms and conditions of this Agreement:

(a)  Lender agrees to temporarily forbear from exercising its remedies under the Loan Documents with respect to the DSCR Default; <u>provided</u>, <u>however</u>, that such temporary forbearance shall immediately terminate on the earlier of (i) the occurrence of a Default Event (as defined below); or (ii) December 31, 2018.  Lender may exercise all of its rights and remedies on account of the DSCR Default upon the termination of such temporary forbearance (as if such temporary forbearance had never occurred), unless as of such termination date Borrower has either (i) fully cured the DSCR Default, including without limitation by paying down the principal balance of the Loan or otherwise causing the Debt Service Coverage Ratio to be 1.00:1.00 after dividends and distributions as of such date, or (ii) paid in full the Loan and all other amounts due to Lender under the Loan Documents.  Nothing in this paragraph is intended to waive or limit any of Lender's rights or remedies under the Loan Documents with respect to any prepayment of all or any portion of the Loan, including without limitation Lender's rights to payment by Borrower of a prepayment fee under Section 2.05 of the Loan Agreement.

(b)  Lender agrees to temporarily forbear from exercising its remedies under the Loan Documents with respect to the Reporting Default; <u>provided</u>, <u>however</u>, that such agreement to temporarily forbear shall immediately terminate on the earlier of (i) the occurrence of a Default Event; or (ii) the date that is thirty (30) days after the Effective Date.  Lender may exercise all of its rights and remedies on account of the Reporting Default (as if the temporary forbearance described in this paragraph had never occurred) if Borrower has not cured the Reporting Default prior to the termination date set forth in the preceding sentence.

4.   Consent. Subject to the terms and conditions of this Agreement:

(a)   Lender **consents to the Subordinated Debt; provided, however, that such** consent (i) is conditioned upon Subordinated Lender, on or about the date of this Agreement, executing and delivering to Lender a subordination agreement in form and **substance satisfactory to Lender** in its sole and **absolute discretion with respect to the** Subordinated Debt (the "Subordination Agreement") and (ii) shall be deemed to be immediately revoked, and Lender shall have the right to exercise all available rights and remedies with respect to the Subordinated Debt Default, upon the occurrence of a Default Event.

(b)   Notwithstanding Lender's right to withhold such funds under Section 3.03 of the Loan Agreement, Lender consents to the release from the Replacement Reserve of up to $140,000 for Borrower's use in paying the holder of the mechanic's lien filed in connection with the Lien Default for certain repair costs identified in Borrower's correspondence to Lender dated June 13, 2018, so long as no Default Event occurs prior to the date of such release; provided, however, that Lender may at its option pay such released funds directly to such lienholder and condition such payment upon such lienholder's execution, delivery and recording of a full and final lien waiver or release satisfactory to Lender. Notwithstanding anything to the contrary, Borrower shall cure the Lien Default on or before July 31, 2018, and cause the applicable mechanic's lien to be fully satisfied and released of record.

(c)   Notwithstanding Section 7.35 of the Loan Agreement, so long as no Default Event has occurred, Lender consents to Borrower incurring a flat management and consulting fee to Manager under that certain Management Agreement described in the Loan Agreement (in lieu of all other fees and amounts due from Borrower to Manager under such Management Agreement or otherwise) in the amount of $200,000 per calendar year, prorated for any partial calendar year and payable in equal monthly installments, and otherwise subject to the Loan Documents and the Subordination of Management Agreement. Upon the occurrence of a Default Event, Lender's consent pursuant to this paragraph shall be deemed to be immediately revoked.

5.   Borrower and Guarantors Acknowledgement. Borrower and Guarantors acknowledge and agree that, as of July 5, 2018, the outstanding principal balance of the Loan was $25,070,739.64, with accrued interest owed of $90,881.43 at a $3,133.84 per diem (plus any interest at the Default Rate, accrued but unpaid fees, and costs), all of which is currently due and owing to Lender, without any defense, right of setoff or counterclaim. Borrower and Guarantors further acknowledge and agree that the any Reserves, including without limitation the Replacement Reserve, held by Lender under the Loan Documents have been frozen by Lender and, notwithstanding any forbearance, consent or other provision herein, no amounts will be released by Lender, nor may be withdrawn by Borrower, therefrom without Lender's express permission.

3

6.    Representations and Warranties. Borrower and each Guarantor represents and warrants to Lender as follows:

(a)    Borrower and Guarantors have all requisite power and authority to execute this Agreement and to perform their respective obligations hereunder, and this Agreement has been duly executed and delivered by Borrower and Guarantors and constitutes the legal, valid and binding obligation of Borrower and Guarantors, enforceable in accordance with its terms.

(b)    All of the representations and warranties contained in the Loan Documents are true and correct on and as of the date hereof as though made on and as of such date.

(c)    There are no Events of Default under the Loan Agreement or other Loan Documents except for the Existing Defaults.

7.    Default Event. The occurrence of one or more of the following shall constitute a "Default Event" within the meaning of this Agreement:

(a)    Borrower or either Guarantor shall fail to abide by or observe any term, condition or covenant of this Agreement, or any representation made by Borrower or either Guarantor herein was materially false when made;

(b)    There shall be any Event of Default, other than the Existing Defaults; or

(c)    Subordinated Lender fails to execute and deliver the Subordination Agreement as required herein, or fails to perform its obligations under and otherwise comply with the terms and conditions of the Subordination Agreement as and when such performance and compliance is required thereunder.

Upon the occurrence of any Default Event or at any time thereafter, Lender shall be entitled to the immediate exercise of all rights and remedies available to it hereunder, under all of the Loan Documents and under applicable law, including without limitation the imposition of interest on the Loan at the Default Rate beginning from the first date of any of the Existing Defaults. Lender shall be entitled to recover all attorneys' fees and costs resulting from any default under this Agreement. Nothing in this Section 7 is intended to limit any of Lender's rights and remedies under any of the Loan Documents.

8.    No Waiver. The execution of this Agreement and acceptance of any documents related hereto shall not be deemed a waiver of any event of default (including the Existing Defaults) under any of the Loan Documents, whether or not known to Lender and whether or not existing on the date of this Agreement. Borrower acknowledges that Lender is not waiving the Existing Defaults, but is simply agreeing to forbear from exercising its rights with respect to the Existing Defaults to the extent expressly set forth in this Agreement.

4

302204204v1 1009714

9.    Release. Borrower and Guarantors hereby absolutely and unconditionally release and forever discharge Lender, and any and all participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns thereof, together with all of the present and former directors, officers, agents and employees of any of the foregoing, from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which Borrower or either Guarantor has had, now has or has made claim against any such person for or by reason of any act, omission, matter, cause or thing whatsoever arising from the beginning of time to and including the date of this Agreement, whether such claims, demands and causes of action are matured or unmatured or known or unknown, and Borrower and Guarantors hereby further acknowledge and agree that as of the date hereof they have no existing defenses to the enforcement of any of the Loan Documents and to the extent that any exist as of the date hereof, each of them are hereby absolutely and forever waived.

10.    Acknowledgement and Reaffirmation of Guarantors. By signing this Agreement, each Guarantor consents and agrees to the terms of this Agreement and acknowledges that all indebtedness arising under the Loan Documents shall continue to constitute obligations guaranteed under the Guaranty. The foregoing confirmation shall not be deemed to limit the terms of the Guaranty in any manner. Each Guarantor acknowledges that this paragraph merely confirms the terms of the Guaranty and that no such confirmation is required in connection with this Agreement. Each Guarantor acknowledges to and agrees with Lender that no events, conditions or circumstances have arisen or exist as of the date hereof which would give the undersigned the right to assert a defense, counterclaim and/or setoff to any claim by Lender for the payment and performance of the obligations of Guarantor under the Guaranty, or to the extent that any such defense, counterclaim and/or setoff exists as of the date hereof, the same are hereby absolutely and forever waived and released.

11.    No Modifications; Entire Agreement. Nothing contained in this Agreement shall be deemed or construed to amend, supplement or modify the Loan Documents or otherwise affect the rights and obligations of any party thereto, all of which remain in full force and effect. This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter herein. This Agreement may not be modified except in writing signed by all parties hereto. Nothing in this Agreement shall constitute or be deemed to be a commitment or agreement on the part of Lender to restructure any indebtedness of Borrower, to amend any of the provisions of Loan Documents, or to forbear from exercising any of Lender's rights and remedies under the Loan Documents except to the limited extent specifically agreed to herein.

12.    Legal Counsel. Borrower and Guarantors hereby warrant and represent to Lender that they consulted with and received advice from legal counsel of their choice with respect to this Agreement and the documents related thereto, or they have had an opportunity to consult with legal counsel of their choice and have made the decision not to consult with legal counsel. Without limiting the forgoing, Borrower and Guarantors acknowledge that they

5

have legal and business options available to them other than the execution and delivery of this Agreement but have nonetheless decided to execute this Agreement and have done so voluntarily and without duress. The parties hereby agree that the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

13.   Further Assurances and Additional Documents. Borrower and Guarantors shall, at the request of Lender, at any time and from time to time following the execution of this Agreement promptly execute and deliver, or cause to be executed and delivered, to Lender all such further documents and instruments and take all such further action as may be reasonably necessary or appropriate to confirm or carry out the provisions and intent of this Agreement, specifically including all documents necessary to the continued perfection of the security interest in the Collateral referenced in the Loan Documents.

14.   Cumulative Rights. Each right, power or remedy herein conferred upon Lender or in the Loan Documents is cumulative and in addition to every other right, power or remedy, express or implied, now or hereafter arising, available to Lender at law or in equity, under the Uniform Commercial Code or other law, or under the Loan Documents, or under any other agreement, and each and every right, power and remedy herein or otherwise existing may be exercised from time to time as often and in such order as may be deemed expedient by Lender, and shall not be a waiver of the right to exercise at any time thereafter any other right, power or remedy. No delay or omission by Lender in the exercise of any right, power or remedy shall impair any such right, power or remedy or the right of any such party to resort thereto at a later date. Nor shall any such delay or omission be construed to be waiver of any default.

15.   Severability of Provisions. Any provision of this Agreement that is prohibited or unenforceable shall be ineffective to the extent of such portion without invalidating the remaining provisions of this Agreement, or any other agreement executed between Lender, on the one hand, and Borrower and/or either Guarantor, on the other hand, or affecting the validity or enforceability of such provisions.

16.   Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon Borrower, Guarantors, Lender and their respective successors, assigns, heirs and personal representatives, except that neither Borrower nor either Guarantor may assign or transfer their rights or obligations hereunder without the prior written consent of Lender.

17.   Governing Law; Jury Trial. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Colorado. BORROWER AND GUARANTORS WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION RELATING TO THIS AGREEMENT AND/OR ANY OF THE OTHER LOAN DOCUMENTS.

18.   Counterparts. This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same agreement, and any party hereto may execute this Agreement by signing and delivering one or more counterparts. Delivery of an executed

6

302204204v1 1009714

counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

19.  No Third Party Reliance.  No third party shall be entitled to rely upon this Agreement or to have any of the rights or benefits hereunder.

20.  Costs and Expenses.  Borrower agrees to pay or reimburse Lender for all of its out-of-pocket costs and expenses incurred in connection with this Agreement, any other documents prepared in connection herewith and the transactions contemplated hereby, including without limitation the reasonable fees and disbursements of counsel to Lender.

[SIGNATURE PAGE FOLLOWS]

302204204v1 1009714

IN WITNESS WHEREOF, the parties have executed this Forbearance and Consent Agreement effective as of the date first above stated.

**Borrower:**

Woolley's Classic Suites-Denver, LLC, a Texas limited liability company

By:  Woolley's Classic Suites, LLC,
a Texas limited liability company
Its:  Manager

By:  Woolley Hotel Company,
a Texas corporation
Its:  Manager

By: _____
Robert E. Woolley, President

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

JEREMIAH ALLEN
Notary Public – California
Contra Costa County
Commission # 2189275
My Comm. Expires Apr 1, 2021

Subscribed and sworn to before me this 4 day of August, 2018.

_____
Notary Public

**Guarantors:**

_____
Robert E. Woolley

Robert Edward Woolley Family Trust

By: _____
Robert E. Woolley, Trustee of the
Robert Edward Woolley Family Trust
U/T/A dated March 9, 2006

8

302204204v1 1009714

Subscribed and sworn to before me this

___ day of _____, 2018.

_____

Notary Public

Lender:

First National Bank, a national bank

By: _____

Todd Christoffer
Divisional President

Subscribed and sworn to before me this

14 day of August, 2018.

_____

Notary Public   S D

Commission Expires 10/22/19

9

302204204v1 1009714